## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FOUNDRY NETWORKS, INC.,                    )
    a Delaware Corporation,                )
                                )
        Plaintiff,                         )
                                  )
        v.                                 )    Civil Action No. _____
                                  )
ALCATEL USA RESOURCES, INC.                )
    a Delaware Corporation,                )    (JURY TRIAL DEMANDED)
ALCATEL INTERNETWORKING, INC.,             )
    a California Corporation,              )
COMPAGNIE FINANCIÈRE ALCATEL               )
    a French Corporation, and              )
ALCATEL S.A.,                              )
    a French Corporation,                  )
                                  )
        Defendants.                        )

## COMPLAINT

Plaintiff Foundry Networks, Inc. ("Foundry") brings this action against Alcatel USA Resources, Inc. ("Alcatel USA Resources"), Alcatel Internetworking, Inc. ("Alcatel Internetworking"), Compagnie Financière Alcatel ("Alcatel Paris"), and Alcatel S.A. (collectively "Alcatel") for violating the Sherman Antitrust Act and engaging in common law fraud. As set forth below, Alcatel (i) duped the Institute of Electrical and Electronics Engineers ("IEEE") into adopting an important, industry-wide standard without disclosing patent applications and providing licensing assurances required by the IEEE's Bylaws, and then (ii) subsequently sued Foundry for patent infringement after Foundry had implemented the standard in reliance on the integrity of the IEEE standard-setting process, reasonably believing it could practice the standard without being subjected to claims of patent infringement. In essence, Alcatel set an illegal trap for Foundry, and

once Foundry was locked-in, Alcatel damaged Foundry by embroiling it in an expensive patent-infringement litigation. As a result, Alcatel has monopolized or attempted to monopolize the market to which the IEEE standard pertains — the technology market for user authentication for port-based network access to LANs (the "Technology Market"). A LAN is a type of computer network; user authentication is the process by which an individual seeks access to resources on a network by validating that he or she is authorized to have such access.

## JURISDICTION AND VENUE

1.      Foundry's complaint arises under the antitrust laws of the United States, 15 U.S.C. §§ 1, 2, 15, 26, and the common law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 1, 2, 15, and 26.

2.      Venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d).

3.      Defendants maintain offices, have agents, transact business or are found within this judicial district. Foundry's claims arise in part within this district, and Defendants' unlawful conduct has had harmful effects in this district. The interstate trade and commerce described herein is and has been carried out in part within this district.

## PARTIES

4.      Foundry is a Delaware corporation with its principal place of business at 4980 Great America Parkway, Santa Clara, California. Foundry manufactures devices, including switches and routers, that incorporate user authentication technology for port-based network access to LANs that comport with IEEE standards.

2

5.      Defendant Alcatel USA Resources is a Delaware corporation with its principal place of business at 3400 W. Plano Parkway, Plano, Collin County, Texas.

6.      Defendant Alcatel Internetworking is a California corporation with its principal place of business at 26801 West Agoura Road, Calabasas, California.

7.      Defendant Alcatel Paris is a French corporation with its principal place of business at 54, rue La Boetie, 75008, Paris, France. Upon information and belief, Alcatel Paris is the ultimate parent entity of Alcatel USA Resources and Alcatel Internetworking. Alcatel Paris does business in the United States.

8.      Defendant Alcatel S.A. is a French Corporation with its principal place of business at 54, rue La Boetie, 75008, Paris, France. It is affiliated with Alcatel Paris, Alcatel USA Resources, and Alcatel Internetworking. Alcatel S.A. does business in the United States.

9.      Upon information and belief, Alcatel USA Resources, Alcatel Internetworking, Alcatel Paris and Alcatel S.A. have functioned as a single entity under the control of Alcatel Paris and/or Alcatel S.A. (collectively "Alcatel France") with respect to the conduct alleged in this Complaint. For that reason all the Alcatel entities are collectively referred to in this Complaint as "Alcatel."

10.     Alcatel is a telecommunications conglomerate with annual revenues of approximately $17 billion. A substantial portion of Alcatel's revenue is generated from licensing its patented technologies, including technologies that purport to cover user authentication for port-based network access to LANs. Alcatel also sells switches and routers incorporating user authentication technology.

3

## FACTS

### Background

11.     For many years, Alcatel was the monopoly supplier of telecommunications equipment to the French telephone monopoly, France Telecom.

12.     After the break-up of the American Telephone and Telegraph Company ("AT&T") monopoly, Alcatel became a significant seller of switches, routers and other communications equipment to telecommunication companies and internet service providers in the United States. Alcatel also amassed a patent portfolio relating to port-based network access to LANs and, upon information and belief, became the dominant licensor of technology for user authentication for port-based network access to LANs.

13.     As the internet grew and Alcatel faced increasing competition from new companies, Alcatel engaged in exclusionary conduct to protect its dominant position in the Technology Market. Among other things, Alcatel engaged in baseless patent litigation. Although, upon information and belief, none of the suits resulted in a favorable verdict or decision, some of the suits resulted in settlements that entrenched Alcatel's power in the Technology Market. One of Alcatel's victims was Cisco. Although Cisco responded by filing an antitrust action against Alcatel alleging sham litigation and although an Alcatel official acknowledged that Alcatel uses "litigation as a deterrent to competition," Alcatel and Cisco reached an agreement whereby, upon information and belief, Cisco licenses Alcatel's user-authentication technology. Upon information and belief, Alcatel has reached similar licensing agreements with other sellers of switches and routers that incorporate user-authentication technology. A distinguished legal scholar from Southern Methodist University commented, "I am

4

concerned that the legal strategy such as Alcatel's will have a chilling effect on innovation. It may be a good strategy from Alcatel's perspective but not a good strategy from society's perspective."

### IEEE's Standard Setting

14.    The IEEE is the leading developer of standards that underpin many aspects of the computer industry, including user authentication. On information and belief, it has more than 300,000 member companies including Alcatel and other industry participants.

15.    The IEEE's standards have a significant impact on the commercial marketplace. When adopted in a manner consistent with the IEEE's Bylaws, the standards can benefit competition. However, when, as here, a competitor abuses the standard-setting process, competition can be, and is, harmed.

16.    Clause 6 of the IEEE-SA Standards Board Bylaws (the "IEEE Bylaws") sets forth the IEEE's rule governing the inclusion in IEEE standards of technologies covered by patents and patent applications. At all relevant times, Clause 6 provided as follows:

> IEEE standards may include the known use of patent(s), including patent applications, provided the IEEE receives assurance from the patent holder or applicant with respect to the patents essential for compliance with both mandatory and optional portions of the standard. This assurance shall be provided without coercion and prior to approval of the standard (or reaffirmation when a patent becomes known after initial approval of the standard). This assurance shall be a letter that is in the form of either
>
> a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to

5

comply with the standard or

b) A statement that a license will be made available
without compensation or under reasonable rates, with
reasonable terms and conditions that are demonstrably free
of any unfair discrimination.

17.    Upon information and belief, the purpose of Clause 6 of the IEEE Bylaws,

which is still in place with substantially the same language, was (i) to ensure that the

IEEE and its members fully understood the costs and benefits of a standard *before*

adopting it, and (ii) to prevent a participant in the standard-setting process from getting

an unfair competitive advantage over others in the industry and subsequently holding

them up.  The IEEE realized the anticompetitive dangers of standard-setting, and it

sought to minimize them.  Accordingly, the IEEE expects participants in standard-setting

to disclose known patent applications or patents that may be required to practice the

standard under consideration.

## Alcatel's Misuse of the Standard-Setting Process

18.    In the late 1990s, the IEEE, acting through its Standards Association

(the "IEEE-SA") and its 802.1X Working Group (the "Working Group"), embarked on a

project to develop an industry-wide standard for an authentication protocol that would

govern port-based network access to LANs and thus provide security for enterprise

networks.  Alcatel participated in the Working Group.

19.    On March 15, 2000, while the 802.1X Working Group was deliberating,

Alcatel filed an application for what later became U.S. Patent No. 6,339,830 ("the '830

patent").  The '830 patent application concerned authentication for users seeking to

connect to a communications network — a process referred to in the '830 patent as "local

edge user authentication."  Alcatel now claims that the '830 patent application and

6

subsequently issued '830 patent have a scope that would render them essential to practicing the 802.1X standard with respect to user-authentication.

20.    Upon information and belief, at least one of the Alcatel participants in the Working Group and/or one of the other Alcatel employees who was aware of such participation was aware of the '830 patent application at the time of such participation.

21.    At its July 10-14, 2000 meeting, the Working Group formally adopted a patent policy whereby a participant is expected to disclose patents and patent applications that the participant believes covers technology described in an 802.1 standard that is under development or has been approved. The Working Group thus implemented Clause 6 of the IEEE Bylaws, which had already been in place for some time.

22.    Upon information and belief, Alcatel did not disclose its '830 patent application to the Working Group or anyone else at the IEEE prior to the IEEE's adoption of its 802.1X standard. Nor did Alcatel provide the assurance letter required under Clause 6 of the IEEE Bylaws.

23.    Upon information and belief, Alcatel was aware, or should have been aware, of the IEEE Bylaws at the time it was participating in the Working Group and prior to the IEEE's adoption of the 802.1X standard.

24.    On or about June 14, 2001, the IEEE adopted the 802.1X standard without receiving any disclosure or assurance from Alcatel regarding any patent application or patent. The 802.1X standard governs authentication for users seeking to connect to networks, and it incorporates technology that Alcatel now claims is covered by its '830 patent.

7

25.    On June 21, 2001, one week after the IEEE had adopted the 802.1X standard, Alcatel secretly filed another patent application ("the '090 patent application") that later matured into U.S. Patent No. 6,874,090 ("the '090 patent"). The '090 patent application was a continuation of the '830 patent application and had substantially the same specifications as the '830 patent application. Upon information and belief, the '090 patent application was designed and prosecuted by Alcatel with the 802.1X standard in mind and with the specific intent of subsequently filing patent infringement cases against users of the 802.1X standard.

26.    Upon information and belief, Alcatel planned to file the '090 patent application prior to the IEEE's adoption of the 802.1X standard.

27.    Upon information and belief, Alcatel knew at the time it filed its '090 patent application that it would later assert that entities such as Foundry that made products incorporating user-authentication technology that conformed to the 802.1X standard infringed its patent. Nevertheless, Alcatel failed to disclose its '090 patent application to the IEEE or to provide any of the assurances set forth in the IEEE Bylaws.

28.    After the IEEE issued the 802.1X standard, Foundry made investments to implement the standard in its products. In doing so, Foundry relied upon the integrity of the IEEE standard-setting process, including conformance by standard-setting participants such as Alcatel with the IEEE Bylaws. In light of Alcatel's conduct, Foundry reasonably believed that it could practice the 802.1X standard without being subjected to Alcatel's unreasonable demands for royalties and costly infringement suit. If Foundry had been aware of Alcatel's patent applications and of Alcatel's contention that the resulting patents had a scope that rendered them essential to user-authentication

technology that conformed to the 802.1X standard, Foundry would have opposed the IEEE's adoption of the standard and/or would have considered alternative technologies. This would have allowed Foundry to avoid Alcatel's demands for unreasonable royalties, to avoid Alcatel's hold-up patent-infringement suit based on patents that resulted from patent applications that were never disclosed to the IEEE prior to the adoption of the IEEE standards, and to have greater choice of user-authentication technology.

29.    The 802.1X standard became the industry standard for the Technology Market.

30.    On January 15, 2002, Alcatel's '830 patent application matured into the '830 patent entitled *Deterministic User Authentication Service for Communication Network.* Alcatel did not disclose the issuance of that patent to either the IEEE or Foundry at the time, nor did it offer at that time any licensing assurances regarding the technology covered by the '830 patent.

31.    In April 2002, Alcatel for the first time disclosed to Foundry the existence of the '830 patent and Alcatel's assertion that Foundry's practice of the 802.1X standard infringed its patent. However, Alcatel did not at that time disclose the '830 patent to the IEEE or provide any licensing assurances. Nor did Alcatel offer to license Foundry on reasonable terms. Indeed, Alcatel was only willing to consider licensing the '830 patent as part of a package containing other patents that Alcatel does not contend are essential to practicing the 802.1X standard with respect to user authentication. Foundry was, and still is, unwilling to pay supracompetitive royalties for a package of patents that it does not need.

9

32.    Foundry responded to Alcatel's threats of patent infringement by informing Alcatel that no matter what claims were included in the '830 patent, Alcatel could not enforce the patent against it given Alcatel's failure to comply with the IEEE Bylaws prior to the IEEE's adoption of the standard. Foundry thus relied on the integrity of the IEEE standard-setting procedure.

33.    On January 13, 2003, more than one-and-a-half years after the IEEE had adopted the 802.1X standard, Alcatel belatedly informed the IEEE of its '830 patent and of its purported willingness to license the '830 patent on reasonable terms. However, Alcatel's licensing offer was both untimely and disingenuous. Moreover, even as of this date, Alcatel asserted that it was not required to provide any assurances, arguing that the '830 patent, which pertains to user authentication, is not "essential" to practicing the 802.1X standard because that standard applies to authentication by either a user or a computer. However, Alcatel is now claiming that the '830 patent has a scope that renders it essential to practicing the 802.1X standard with respect to user authentication. Moreover, upon information and belief, Alcatel has at all relevant times been aware that the '830 patent, as construed by Alcatel, is essential to practicing the 802.1X standard in all respects, not just user authentication, because a commercially viable switch must be capable of both user authentication and computer authentication.

34.    Notwithstanding its January 13, 2003 letter, Alcatel did not offer, and still has not offered, reasonable, unbundled licensing terms to Foundry for '830 patent rights. Moreover, the disingenuous nature of Alcatel's representation that it would license its '830 patent on reasonable nondiscriminatory terms was further demonstrated by Alcatel's continued concealment of its '090 patent application from both the IEEE and Foundry

10

notwithstanding that the '090 patent application had a specification and claims that were substantially similar to those of the '830 patent.

35.    In 2004, the IEEE adopted a revised standard known as 802.1X REV. Upon information and belief, Alcatel knew that the IEEE was considering adopting the revised standard, and Alcatel knew that it would subsequently claim that entities such as Foundry that made products incorporating user-authentication technology that conform to the 802.1X REV standard infringe the '090 patent that resulted from Alcatel's '090 patent application. Nevertheless, Alcatel did not disclose its '090 patent application to the IEEE nor provide the assurances required by the IEEE Bylaws prior to the IEEE's adoption of the 802.1X REV standard. Indeed, to this day, Alcatel has not offered to license rights in its '090 patent to Foundry.

36.    On March 29, 2005, the U.S. Patent Office issued the '090 patent. The claims of the '090 patent are substantially similar to the claims of the '830 patent. As construed by Alcatel, the '090 patent is essential to practicing the 802.1X REV standard as well as the original 802.1X standard with respect to user authentication. Nevertheless, Alcatel failed to provide any assurance to the IEEE that Alcatel would license its '090 patent on reasonable, nondiscriminatory terms.

37.    On or about June 21, 2005, Alcatel USA Resources and Alcatel Internetworking sued Foundry in the U.S. District Court for the District of Delaware, alleging that Foundry had infringed the '830 and '090 patents by selling products that incorporated user-authentication technology that conform to the 802.1X standard and the 802.1X REV standard. In substance, Alcatel is now claiming that its '830 and '090 patents are essential to practicing the 802.1X standards because, as mentioned above, to

11

be commercially viable, a switch or router that is made in conformance with the 802.1X standard must provide for user authentication, not just computer authentication.

38.    Alcatel's suit seeks an injunction, which, if granted, would cause severe and irreparable injury to Foundry.

39.    On May 6, 2006, Foundry wrote to Alcatel and requested a statement of whether and on what terms Alcatel would license Foundry to use the technology covered by the '830 and the '090 patents.

40.    On May 22, 2006, Alcatel responded that it would not discuss licensing terms to Foundry except in the context either of a litigation settlement or a discovery request and subject to other unreasonable conditions.

41.    In April 2006, Alcatel announced it was merging with Lucent Technologies, a major customer of Foundry's. The merger will further entrench Alcatel's market power and harm competition.

## COUNT I

### (Sherman Act § 2)

42.    Foundry realleges and incorporates by reference each and every allegation set forth above.

43.    Alcatel possesses either monopoly power or the dangerous probability of acquiring monopoly power in the Technology Market. The geographic scope of the Technology Market is worldwide.

44.    Upon information and belief, Alcatel is the dominant licensor of technology for user authentication for port-based network access to LANs. Upon information and belief, Alcatel has licensed Cisco, Juniper Networks, and others under

the '830 and/or '090 patents. Upon information and belief, Alcatel's share of the Technology Market (based, among other things, on licenses it has granted) significantly exceeds 60%.

45.    Barriers to entry for the Technology Market are high. Among the barriers to entry are the IEEE 802.1X standard, Alcatel's patent-infringement claims against Foundry, and Alcatel's contention that its '090 and '830 patents have a scope that renders them essential to practice the IEEE 802.1X standard with respect to user authentication.

46.    Network effects magnify the entry barriers.

47.    Alcatel engaged in an exclusionary practice by failing to make the disclosures and assurances required by the IEEE Bylaws, thus lulling the IEEE into unknowingly adopting a standard for user authentication, the practice of which Alcatel planned to, and subsequently did, allege infringed its patents.

48.    Pursuant to the requirements of the IEEE Bylaws, Alcatel had a duty to disclose its '830 patent application and to make the required assurances prior to the IEEE's adoption of the 802.1X standard. Moreover, Alcatel had a duty to disclose its '090 patent application and to make the required assurances prior to the IEEE's adoption of the 802.1X REV standard. Alcatel assumed these duties when it first chose to voluntarily participate in the IEEE standard-setting process because of its belief that the technology that is the subject of the respective patent applications is essential to practicing the 802.1X standard with respect to user authentication.

49.    Upon information and belief, IEEE members understood the IEEE Bylaws as imposing a disclosure duty on participants in IEEE standard setting who believe that

their patents or patent applications relate to an IEEE standard and might be reasonably necessary to practice an IEEE standard.

50.    At the time the IEEE adopted the 802.1X standard, there were alternative user-authentication technologies that the IEEE could have adopted.

51.    Alcatel also had a duty to disclose to the IEEE the imminent filing of its '090 patent application because Alcatel knew it would subsequently assert that the '090 patent had a scope that renders it essential to practice the IEEE 802.1X standard with respect to user authentication.

52.    At the time the IEEE adopted the 802.1X standard, the IEEE and Foundry relied on Alcatel's silence in the face of Alcatel's duty to disclose its patent applications and to provide the required assurances with respect to its '830 patent application.

53.    At the time the IEEE adopted the 802.1X REV standard, the IEEE and Foundry relied on Alcatel's silence in the face of Alcatel's duty to disclose its patent applications and to provide the required assurances with respect to its '090 patent application.

54.    Upon information and belief, the IEEE also relied upon Alcatel's disingenuous January 2003 offer to the IEEE to license the '830 patent in accordance with the IEEE Bylaws. Foundry in turn relied on the integrity of the IEEE standard-setting process.

55.    If the IEEE had known of Alcatel's patent applications and of Alcatel's intention to subsequently assert patent-infringement claims against entities that sell products incorporating user-authentication technology that conforms to the 802.1X standards, the IEEE could not have adopted the standards unless Alcatel had first

provided the assurances required by the IEEE Bylaws. Alcatel never provided the required assurances. In the case of the '830 patent, Alcatel's assurance was a year-and-one-half late and made without the intention of acting in accordance with it.

56.     Upon information and belief, if the IEEE had not adopted the 802.1X and the 802.1X REV standards, competition and innovation would have continued in the Technology Market at a much faster pace to the benefit of Foundry and other participants in that market. IEEE placed this letter on its website. As a result, Foundry would have had more options and lower prices with respect to the user authentication technology for its switches and routers and would have been less susceptible to being held-up by Alcatel.

57.     Foundry relied on the integrity of the IEEE standard-setting process and proceeded to make investments in producing and promoting products that were substantially compliant with the 802.1X and 802.1X REV standards. As the 802.1X and 802.1X REV standards became the industry standard, Foundry became locked-in to the standard.

58.     A reasonable royalty rate for the '830 and '090 patents would have been considerably lower prior to the IEEE's adoption of the 802.1X and 802.1X REV standards than now when the standards have been widely adopted and Alcatel has gained the monopoly power that it had specifically intended to achieve.

59.     Alcatel's exclusionary conduct includes tying (i) its '830 and '090 patents, which Alcatel contends have a scope that renders them essential to practice the 802.1X standards with respect to user authentication to (ii) its other patents that Alcatel does not contend are essential for such practice. Alcatel has thus sought to coerce Foundry into licensing either a package of patents at a supracompetitive royalty rate, or no patents at

all. Alcatel has substantial market power in the Technology Market with respect to its '830 and '090 patents and, upon information and belief, engages in a substantial amount of commerce in the markets for its other bundled patents. Upon information and belief, Alcatel's tie put Foundry at a competitive disadvantage vis-à-vis Alcatel and Alcatel licensees against which Foundry competed.

60.     As set forth above, Alcatel has willfully acquired and maintained its monopoly power in the Technology Market, as distinct from acquiring it as a consequence of a superior skill, business acumen or accident.

61.     As evidenced by its exclusionary conduct, Alcatel had the specific intent to monopolize the Technology Market.

62.     Alcatel's exclusionary conduct first damaged Foundry when Alcatel filed suit against Foundry alleging patent infringement. Alcatel's patent infringement suit has caused Foundry to incur legal fees of more than $1 million and it has distracted Foundry from the marketplace, rendering it less competitive, and causing it to suffer lost profits

63.     Foundry has standing to complain about Alcatel's anticompetitive conduct because Foundry is both a participant in the Technology Market and a seller of devices that provide user authentication for port-based network access to LANs. Foundry's injuries flow from the anticompetitive aspects of Alcatel's conduct, which include foreclosure of competition in the Technology Market and raising rivals' costs.

64.     As a result of engaging in the conduct set forth above, Alcatel has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

65.    Alcatel's anticompetitive conduct has caused Foundry to suffer injury to its business and property and caused it to incur costs that it otherwise would not have incurred and to suffer lost profits and a slower growth rate.

## COUNT II

### (Common Law Fraud)

66.    Foundry realleges and incorporates by reference each and every allegation set forth above.

67.    By participating in the Working Group, Alcatel voluntarily assumed a duty to the IEEE, its members, and those who use its standards to provide the assurances mandated by the IEEE Bylaws with respect to the '830 patent application and the imminent '090 patent application prior to the IEEE's adoption of the 802.1X standard. However, Alcatel knowingly and intentionally failed to provide the required assurances prior to the IEEE's adoption of the 802.1X standard.

68.    Based on its participation in the 802.1X Working Group and its knowledge of the IEEE's development of a revised standard, Alcatel also had a duty to the IEEE, its members, and users of its standards to provide the assurances mandated by the IEEE Bylaws with respect to the '090 patent application prior to the IEEE's adoption of the 802.1X REV standard. However, Alcatel knowingly and intentionally failed to disclose its '090 patent application or to provide the required assurances prior to the IEEE's adoption of the 802.1X REV standard. Moreover, after the '090 patent was issued, Alcatel did not offer to license the technology covered by its '090 patent.

69.    The '830 patent application (and subsequently issued '830 patent) as construed by Alcatel is material to practicing the 802.1X standard.

17

70.    Both the '830 patent and the '090 patent application (and subsequently issued '090 patent) as construed by Alcatel are material to practicing the 802.1X REV standard.

71.    The IEEE and Foundry relied upon Alcatel's failure to disclose its '830 patent application prior to the IEEE's adoption of the 802.1X standard.

72.    The IEEE and Foundry relied upon Alcatel's failure to disclose the '090 patent application prior to the IEEE's adoption of the 802.1X REV standard.  Foundry also relied on the integrity of the IEEE's standard-setting process to the extent that Alcatel was required to provide a timely assurance letter regarding the '090 patent application.

73.    Alcatel's January 13, 2003, representation to the IEEE providing assurance that it would license its '830 patent technology on reasonable and nondiscriminatory terms was false and misleading and, upon information and belief, was intended to be so.

74.    As set forth above, Foundry reasonably relied on Alcatel's misconduct, and that reliance was reasonably foreseeable to Alcatel.

75.    Alcatel fraudulently entrapped Foundry by failing to make required disclosures and then injured Foundry when Alcatel sued for patent infringement after Foundry had practiced the IEEE standards, causing Foundry to incur significant costs. To date, Foundry has incurred more than $1 million in legal fees and related expenses.

76.    Alcatel's conduct as set forth above, constitutes common law fraud.

## PRAYER FOR RELIEF

WHEREFORE, Foundry prays that this Court enter judgment:

A.    That Foundry recover its actual and compensatory damages according to proof at trial;

B.    That Foundry's damages be trebled in accordance with the antitrust laws;

C.    That Foundry be awarded pre- and post-judgment interest as permitted by law;

D.    That Alcatel and its agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from any further prosecution of the '830 and '090 patents and any other patents that are alleged to read on the 802.1X standard and/or the 802.1X REV standard;

E.    That Alcatel and its agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from refusing to license to Foundry, on reasonable and non-discriminatory terms, the '830 and '090 patents and any other patents or patent applications that are alleged to read on the 802.1X standard and/or the 802.1X REV standard, on stand-alone bases;

F.    That Foundry be awarded punitive damages;

G.    That Foundry be awarded its reasonable attorneys' fees and costs of suit as allowed by law; and

H.    That the Court grant Foundry such other and further relief as the Court

may deem just and proper.

## **JURY DEMAND**

Foundry demands a trial by jury as to all issues so triable.

POTTER ANDERSON & CORROON LLP

Of Counsel:

William L. Anthony
Matthew H. Poppe
Michael F. Heafey
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025
(650) 614-7400

Garret G. Rasmussen
Antony P. Kim
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, DC 20007-5135
(202) 339-8400

Dated:  August 1, 2006
743477

By: _____
     Philip A. Rovner (#3215)
     Hercules Plaza
     P.O. Box 951
     Wilmington, Delaware  19899-0951
     (302) 984-6000
     provner@potteranderson.com

*Attorneys for Plaintiff Foundry Networks, Inc.*

JS 44   (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

FOUNDRY NETWORKS, INC.

**DEFENDANTS**

ALCATEL USA RESOURCES, INC., ALCATEL INTERNETWORKING, INC., COMPAGNIE FINANCIERE ALCATEL, ALCATEL, S.A.

(b) County of Residence of First Listed Plaintiff  Santa Clara
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Philip A. Rovner, Esq.
Potter Anderson & Corroon LLP
P.O. Box 951
Wilmington, DE  19899      (302) 984-6000

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Action arises under Antitrust laws of the U.S., 15 U.S.C. Sections 2, 15 and 26

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  Sue L. Robinson

DOCKET NUMBER  05-418

DATE  8-1-06

SIGNATURE OF ATTORNEY OF RECORD  _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b.) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___4___ COPIES OF AO FORM 85.

AUG 0 1 2006
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Dustin M. Frohlich
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action