**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FOUNDRY NETWORKS, INC.,      )
   a Delaware Corporation,      )
                              )
       Plaintiff,           )
                              )
      v.                     )   Civil Action No. 06-470-SLR
                              )
ALCATEL USA RESOURCES, INC.     )
   a Delaware Corporation,      )   (JURY TRIAL DEMANDED)
ALCATEL INTERNETWORKING, INC.,  )
   a California Corporation,     )
COMPAGNIE FINANCIÈRE ALCATEL  )
   a French Corporation, and    )
ALCATEL S.A.,                  )
   a French Corporation,       )
                              )
       Defendants.         )

## AMENDED COMPLAINT

Plaintiff Foundry Networks, Inc. ("Foundry") brings this action against Alcatel

USA Resources, Inc. ("Alcatel USA Resources"), Alcatel Internetworking, Inc. ("Alcatel

Internetworking"), Compagnie Financière Alcatel ("Alcatel Paris"), and Alcatel S.A.

(collectively "Alcatel") for violating the Sherman Antitrust Act and engaging in common

law fraud. As set forth below, Alcatel (i) duped the Institute of Electrical and Electronics

Engineers ("IEEE") into adopting an important, industry-wide standard without

disclosing patent applications and providing licensing assurances required by the IEEE's

Bylaws, and then (ii) subsequently sued Foundry for patent infringement after Foundry

had implemented the standard in reliance on the integrity of the IEEE standard-setting

process, reasonably believing it could practice the standard without being subjected to

claims of patent infringement. In essence, Alcatel set an illegal trap for Foundry, and

once Foundry was locked-in, Alcatel damaged Foundry by embroiling it in an expensive

patent-infringement litigation, seeking to hold it up for supracompetitive royalties. Such

conduct constitutes monopolization of, or an attempt to monopolize, the market to which

the IEEE standard pertains — the technology market for user authentication for port-

based network access to LANs (the "Technology Market") – in violation of the antitrust

laws. A LAN is a type of computer network; user authentication is the process by which

an individual seeks access to resources on a network by validating that he or she is

authorized to have such access.

## JURISDICTION AND VENUE

1.      Foundry's complaint arises under the antitrust laws of the United States,

15 U.S.C. §§ 1, 2, 15, 26, and the common law. This Court has subject matter

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 1, 2, 15, and

26.

2.      Venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act,

15 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d).

3.      Defendants maintain offices, have agents, transact business or are found

within this judicial district. Foundry's claims arise in part within this district, and

Defendants' unlawful conduct has had harmful effects in this district. The interstate trade

and commerce described herein is and has been carried out in part within this district.

## PARTIES

4.      Foundry is a Delaware corporation with its principal place of business at

4980 Great America Parkway, Santa Clara, California. Foundry manufactures devices,

including switches and routers, that incorporate user authentication technology for port-based network access to LANs that comport with IEEE standards.

5.    Defendant Alcatel USA Resources is a Delaware corporation with its principal place of business at 3400 W. Plano Parkway, Plano, Collin County, Texas.

6.    Defendant Alcatel Internetworking is a California corporation with its principal place of business at 26801 West Agoura Road, Calabasas, California

7.    Defendant Alcatel Paris is a French corporation with its principal place of business at 54, rue La Boetie, 75008, Paris, France. Upon information and belief, Alcatel Paris is the ultimate parent entity of Alcatel USA Resources and Alcatel Internetworking. Alcatel Paris does business in the United States.

8.    Defendant Alcatel S.A. is a French Corporation with its principal place of business at 54, rue La Boetie, 75008, Paris, France. It is affiliated with Alcatel Paris, Alcatel USA Resources, and Alcatel Internetworking. Alcatel S.A. does business in the United States.

9.    Upon information and belief, Alcatel USA Resources, Alcatel Internetworking, Alcatel Paris and Alcatel S.A. have functioned as a single entity under the control of Alcatel Paris and/or Alcatel S.A. (collectively "Alcatel France") with respect to the conduct alleged in this Complaint. For that reason all the Alcatel entities are collectively referred to in this Complaint as "Alcatel."

10.    Alcatel is a telecommunications conglomerate with annual revenues of approximately $17 billion. A substantial portion of Alcatel's revenue is generated from licensing its patented technologies, including technologies that purport to cover user

3

authentication for port-based network access to LANs. Alcatel also sells switches and routers incorporating user authentication technology.

## FACTS

### Background

11.    For many years, Alcatel was the monopoly supplier of telecommunications equipment to the French telephone monopoly, France Telecom.

12.    After the break-up of the American Telephone and Telegraph Company ("AT&T") monopoly, Alcatel became a significant seller of switches, routers and other communications equipment to telecommunication companies and internet service providers in the United States. Alcatel also amassed a patent portfolio relating to port-based network access to LANs and, upon information and belief, became the dominant licensor of technology for user authentication for port-based network access to LANs.

13.    As the internet grew and Alcatel faced increasing competition from new companies, Alcatel engaged in exclusionary conduct to protect its dominant position in the Technology Market. Among other things, Alcatel engaged in baseless patent litigation. Although, upon information and belief, none of the suits resulted in a favorable verdict or decision, some of the suits resulted in settlements that entrenched Alcatel's power in the Technology Market. One of Alcatel's victims was Cisco. Although Cisco responded by filing an antitrust action against Alcatel alleging sham litigation and although an Alcatel official acknowledged that Alcatel uses "litigation as a deterrent to competition," Alcatel and Cisco reached an agreement whereby, upon information and belief, Cisco licenses Alcatel's user-authentication technology. Upon information and belief, Alcatel has reached similar licensing agreements with other

4

sellers of switches and routers that incorporate user-authentication technology. A distinguished legal scholar from Southern Methodist University commented, "I am concerned that the legal strategy such as Alcatel's will have a chilling effect on innovation. It may be a good strategy from Alcatel's perspective but not a good strategy from society's perspective."

### IEEE's Standard Setting

14.     The IEEE is the leading developer of standards that underpin many aspects of the computer industry, including user authentication. On information and belief, it has more than 300,000 member companies including Alcatel and other industry participants.

15.     The IEEE's standards have a significant impact on the commercial marketplace. When adopted in a manner consistent with the IEEE's Bylaws, the standards can benefit competition. However, when, as here, a competitor abuses the standard-setting process, competition can be, and is, harmed. Indeed, as the Federal Trade Commission recently stated in its *Rambus* decision, conduct that distorts standard-setting can have "grave implications for competition."

16.     Clause 6 of the IEEE-SA Standards Board Bylaws (the "IEEE Bylaws") sets forth the IEEE's rule governing the inclusion in IEEE standards of technologies covered by patents and patent applications. At all relevant times, Clause 6 provided as follows:

> IEEE standards may include the known use of patent(s), including patent applications, provided the IEEE receives assurance from the patent holder or applicant with respect to the patents essential for compliance with both mandatory and optional portions of the standard. This assurance shall be provided without coercion and prior to approval of the

standard (or reaffirmation when a patent becomes known after initial approval of the standard). This assurance shall be a letter that is in the form of either

a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or

b) A statement that a license will be made available without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

17.     Upon information and belief, the purpose of Clause 6 of the IEEE Bylaws, which is still in place with substantially the same language, was (i) to ensure that the IEEE and its members fully understood the costs and benefits of a standard *before* adopting it, and (ii) to prevent a participant in the standard-setting process from getting an unfair competitive advantage over others in the industry and subsequently holding them up. The IEEE realized the anticompetitive dangers of standard-setting, and it sought to minimize them. Accordingly, the IEEE expects participants in standard-setting to disclose known patent applications or patents that may be required to practice the standard under consideration.

18.     Upon information and belief, IEEE members and other participants in IEEE standard setting understood that they were to disclose patents and patent applications that they believed might be essential to practicing a standard that the IEEE was considering adopting.

19.     As a member of and/or participant in the IEEE, Alcatel had a duty to comply with IEEE Bylaws and to operate in good faith in its dealings with the IEEE.

6

## Alcatel's Misuse of the Standard-Setting Process

20.     In the late 1990s, the IEEE, acting through its Standards Association (the "IEEE-SA") and its 802.1X Working Group (the "Working Group"), embarked on a project to develop an industry-wide standard for an authentication protocol that would govern port-based network access to LANs and thus provide security for enterprise networks. Alcatel participated in the Working Group.

21.     On March 15, 2000, while the 802.1X Working Group was deliberating, Alcatel filed an application for what later became U.S. Patent No. 6,339,830 ("the '830 patent"). The '830 patent application concerned authentication for users seeking to connect to a communications network — a process referred to in the '830 patent as "local edge user authentication." Alcatel now claims that the '830 patent application and subsequently issued '830 patent have a scope that would render them essential to practicing the 802.1X standard with respect to user-authentication.

22.     Upon information and belief, at least one of the Alcatel participants in the Working Group and/or one of the other Alcatel employees who was aware of such participation was aware of the '830 patent application at the time of such participation.

23.     At its July 10-14 2000 meeting, the 802.1 Working Group formally adopted a patent policy whereby a participant is expected to disclose patents and patent applications that the participant believes covers technology described in an 802.1 standard that is under development or has been approved. The 802.1 Working Group thus  confirmed the applicability of Clause 6 of the IEEE Bylaws, which had already been in place for some time.

7

24.     Upon information and belief, Alcatel did not disclose its '830 patent application to the Working Group or anyone else at the IEEE prior to the IEEE's adoption of its 802.1X standard.  Nor did Alcatel provide the assurance letter required under Clause 6 of the IEEE Bylaws.

25.     Upon information and belief, Alcatel was aware, or should have been aware, of the IEEE Bylaws at the time it was participating in the Working Group and prior to the IEEE's adoption of the 802.1X standard.

26.     On or about June 14, 2001, the IEEE adopted the 802.1X standard without receiving any disclosure or assurance from Alcatel regarding any patent application or patent.

27.     The 802.1X standard governs authentication for users seeking to connect to networks, and it incorporates technology that Alcatel now claims is covered by its '830 patent.

28.     On June 21, 2001, one week after the IEEE had adopted the 802.1X standard, Alcatel secretly filed another patent application ("the '090 patent application") that later matured into U.S. Patent No. 6,874,090 ("the '090 patent").  The '090 patent application was a continuation of the '830 patent application and had substantially the same specifications as the '830 patent application.  Upon information and belief, the '090 patent application was designed prior to the IEEE's adoption of the 802.1X standard and prosecuted by Alcatel with the specific intent of subsequently filing patent infringement cases against users of the 802.1X standard and holding them up.

29.     Upon information and belief, Alcatel had drafted its '090 patent application prior to the IEEE's adoption of the 802.1X standard and had sought to tailor

8

the claims of its '090 patent application to the 802.1X standard based on information that Alcatel learned through the 802.1X Working Group. Thus, at the time the IEEE adopted the 802.1X standard, Alcatel's '090 patent application was no longer merely an idea, hope, or intention.

30.    Upon information and belief, Alcatel specifically intended at both the time the 802.1X standard was adopted and the time Alcatel filed its '090 patent application that it would later assert patent infringement claims against entities such as Foundry that make products incorporating user-authentication technology that conform to the 802.1X standard. Nevertheless, Alcatel failed to disclose its '090 patent application to the IEEE or to provide any of the assurances set forth in the IEEE Bylaws.

31.    If the IEEE had been aware of Alcatel's patent applications and of Alcatel's contention that the resulting patents had a scope that rendered them essential to user-authentication technology that conforms to the 802.1X standard, the IEEE would not have been able to include Alcatel technology in the 802.1X standard unless Alcatel had first provided reasonable and non-discriminatory ("RAND") assurances and an opportunity for licensing negotiations prior to the IEEE's adoption of the standard. This would have allowed Foundry to avoid subsequently being held up by Alcatel once the standard had been adopted by the IEEE and the industry had become locked-in to the standard. At a minimum, Alcatel's disclosure of its '830 patent application would have permitted IEEE members the ability to assess the costs and benefits of the standard before adopting it (*i.e., ex ante*) and permitted industry participants the opportunity to negotiate royalties *ex ante*, before Alcatel's patents were locked in.

9

32.    After the IEEE adopted the 802.1X standard, IEEE members and other industry participants implemented the 802.1X standard in their products.

33.    Within one year of its adoption by the IEEE, the 802.1X standard became the industry standard for the Technology Market.

34.    Once the 802.1X standard became the industry standard, industry members were locked-in to the standard.   By that time, the cost of switching to another standard was prohibitively high and, upon information and belief, innovation for alternative technologies had diminished.

35.    Once the 802.1X standard became locked-in as the industry standard, manufacturers of switches and routers had to include, as a practical commercial matter, both user authentication and computer-authentication technology that conformed to the 802.1X standard.

36.    After the IEEE issued the 802.1X standard and after that standard began to emerge as the industry standard, Foundry made sunk-cost investments to implement the standard in its products.  In doing so, Foundry relied upon the integrity of the IEEE standard-setting process, including its understanding – based on Alcatel's failure to disclose any patent applications or patents prior to the implementation of the 802.1X standard – that it could practice the standard without being held-up by Alcatel for supracompetitive royalty claims.

37.    On January 15, 2002, Alcatel's '830 patent application matured into the '830 patent entitled *Deterministic User Authentication Service for Communication Network.*  Alcatel did not disclose the issuance of that patent to either the IEEE or

10

Foundry at the time, nor did it offer at that time any licensing assurances regarding the technology covered by the '830 patent.

38.     In April 2002, Alcatel for the first time disclosed to Foundry the existence of the '830 patent and Alcatel's assertion that Foundry's practice of the 802.1X standard infringed its patent. However, Alcatel did not at that time disclose the '830 patent to the IEEE or provide any licensing assurances. Nor did Alcatel offer to license Foundry on reasonable terms. Indeed, Alcatel was only willing to consider licensing the '830 patent as part of a package containing other patents that Alcatel does not contend are essential to practicing the 802.1X standard with respect to user authentication. Foundry was, and still is, unwilling to pay supracompetitive royalties for a package of patents that it does not need.

39.     Foundry responded to Alcatel's threats of patent infringement by informing Alcatel that no matter what claims were included in the '830 patent, Alcatel could not enforce the patent against it given Alcatel's failure to comply with the IEEE Bylaws prior to the IEEE's adoption of the standard. Foundry thus relied on the integrity of the IEEE standard-setting procedure to fend off Alcatel's first hold-up attempt.

40.     On January 13, 2003, more than one-and-a-half years after the IEEE had adopted the 802.1X standard, Alcatel belatedly informed the IEEE of its '830 patent and of its purported willingness to license the '830 patent on reasonable terms. However, by that time the 802.1X standard had become locked in and Alcatel had gained significant market power that it had not had prior to the adoption of the 802.1X standard. Although Alcatel still continued to assert that it was not required to provide any assurances, Alcatel knew that it soon would be asserting claims that the '830 patent has a scope that renders it

essential to practicing the 802.1X standard with respect to user authentication. Moreover, upon information and belief, Alcatel has at all relevant times specifically intended that the '830 patent, as construed by Alcatel, be essential to practicing the 802.1X standard in all respects, not just user authentication, because a commercially viable switch must be capable of both user authentication and computer authentication.

41.     Notwithstanding its purported willingness to voluntarily license the technology that it now claims is essential to practicing the 802.1X standard, Alcatel did not offer, and still has not offered, reasonable, unbundled licensing terms to Foundry for '830 patent rights.

42.     The disingenuous nature of Alcatel's January 13, 2003 representation that it would license its '830 patent on reasonable nondiscriminatory terms was further demonstrated by Alcatel's continued concealment of its '090 patent application from both the IEEE and Foundry notwithstanding that the '090 patent application had a specification and claims that were substantially similar to those of the '830 patent.

43.     In 2004, the IEEE adopted a revised standard known as 802.1X REV. Upon information and belief, Alcatel knew that the IEEE was considering adopting the revised standard, and Alcatel knew that it would subsequently claim that entities such as Foundry that made products incorporating user-authentication technology that conform to the 802.1X REV standard infringe the '090 patent that resulted from Alcatel's '090 patent application. Nevertheless, Alcatel did not disclose its '090 patent application to the IEEE nor provide the assurances required by the IEEE Bylaws prior to the IEEE's adoption of the 802.1X REV standard. Indeed, to this day, Alcatel has not offered to license rights in its '090 patent to Foundry.

12

44.    On March 29, 2005, the U.S. Patent Office issued the '090 patent. As construed by Alcatel, the '090 patent is essential to practicing the 802.1X REV standard as well as the original 802.1X standard with respect to user authentication. Nevertheless, Alcatel failed to provide any assurance to the IEEE that Alcatel would license its '090 patent on reasonable, nondiscriminatory terms.

45.    On or about June 21, 2005, Alcatel USA Resources and Alcatel Internetworking sued Foundry in the U.S. District Court for the District of Delaware, alleging that Foundry had infringed the '830 and '090 patents by selling products that incorporated user-authentication technology that conform to the 802.1X standard and the 802.1X REV standard. In substance, Alcatel is now claiming that its '830 and '090 patents are essential to practicing the 802.1X standards.

46.    Alcatel's suit seeks an injunction, which, if granted, would cause severe and irreparable injury to Foundry.

47.    On May 6, 2006, Foundry wrote to Alcatel and requested a statement of whether and on what terms Alcatel would license Foundry to use the technology covered by the '830 and the '090 patents.

48.    On May 22, 2006, Alcatel responded that it would not discuss licensing terms to Foundry except in the context either of a litigation settlement or a discovery request and subject to other unreasonable conditions.

49.    In April 2006, Alcatel announced it was merging with Lucent Technologies, a major customer of Foundry's. The merger will further entrench Alcatel's market power and harm competition.

## COUNT I

### (Sherman Act § 2)

50.     Foundry realleges and incorporates by reference each and every allegation set forth above.

51.     Alcatel possesses either monopoly power or the dangerous probability of acquiring monopoly power in the Technology Market. The geographic scope of the Technology Market is worldwide.

52.     Upon information and belief, Alcatel is the dominant licensor of technology for user authentication for port-based network access to LANs. Upon information and belief, Alcatel has licensed Cisco, Juniper Networks, and others under the '830 and/or '090 patents. Upon information and belief, Alcatel's share of the Technology Market (based, among other things, on licenses it has granted) significantly exceeds 60%.

53.     Barriers to entry for the Technology Market are high. Among the barriers to entry are the IEEE 802.1X standard, Alcatel's patent-infringement claims against Foundry, and Alcatel's contention that its '090 and '830 patents have a scope that renders them essential to practice the IEEE 802.1X standard with respect to user authentication.

54.     Network effects magnify the entry barriers.

55.     Alcatel engaged in an exclusionary practice by failing to make the disclosures and assurances required by the IEEE Bylaws, thus lulling the IEEE into unknowingly adopting a standard for user authentication, the practice of which Alcatel planned to, and subsequently did, allege infringed its patents.

56.    Pursuant to the requirements of the IEEE Bylaws, Alcatel, as an IEEE member and/or participant, had a duty to disclose its '830 patent application and to make the required assurances <u>prior</u> to the IEEE's adoption of the 802.1X standard.  Moreover, Alcatel had a duty to disclose its '090 patent application and to make the required assurances <u>prior</u> to the IEEE's adoption of the 802.1X REV standard.  Alcatel first assumed these duties when it joined the IEEE and/or commenced participation in IEEE activities, and it further assumed them when it chose to voluntarily participate in the IEEE standard-setting process because of its belief that the technology that is the subject of the respective patent applications is essential to practicing the '802.1X standard with respect to user authentication.

57.    Upon information and belief, IEEE members and the participants in IEEE activities understood the IEEE Bylaws as imposing a disclosure duty on IEEE members as well as participants in IEEE standard-setting who believe that their patents or patent applications relate to an IEEE standard and might be reasonably necessary to practice an IEEE standard.

58.    Alcatel willfully disregarded its duty to disclose its patent applications and to provide the assurances mandated by clause 6 of the Bylaws.  Alcatel sat silently when other members discussed and adopted technologies that allegedly became subject to Alcatel's evolving patent claims.  Moreover, on information and belief, Alcatel actively encouraged the incorporation of methods into the 802.1X standard that it intended to be covered by its '830 and '090 patent applications.

59.    Upon information and belief, the cost of implementing IEEE standards and the magnitude of potential royalties are crucial to the decision-making process of IEEE members and industry participants

60.    Alcatel thwarted the ability of the IEEE and of industry members to make informed choices based on complete information with respect to user authentication technology and the 802.1X standard as a whole.

61.    Alcatel purposefully misled the IEEE into adopting the 802.1X standard and subsequently the 802.1X REV standard by giving an impression that its intellectual property rights were not implicated or that it would not be enforcing any patent rights against users of the standards.

62.    At the time the IEEE adopted the 802.1X standard, there were alternative user-authentication technologies that the IEEE could have adopted.  Upon information and belief, some of the alternatives were better than or equal to the 802.1X standard on a cost/performance basis.

63.    At the time the IEEE adopted the 802.1X standard, the IEEE relied on Alcatel's silence in the face of Alcatel's duty to disclose its patent applications and to provide the required assurances with respect to its '830 patent application.

64.    At the time the IEEE adopted the 802.1X REV standard, the IEEE relied on Alcatel's silence in the face of Alcatel's duty to disclose its patent applications and to provide the required assurances with respect to its '090 patent application.

65.    Upon information and belief, the IEEE also relied upon Alcatel's disingenuous January 2003 offer to the IEEE to license the '830 patent in accordance with

16

the IEEE Bylaws. Foundry in turn relied on the integrity of the IEEE standard-setting process.

66.    If the IEEE had known of Alcatel's patent applications and of Alcatel's intention to subsequently assert patent-infringement claims against entities that sell products incorporating user-authentication technology that conforms to the 802.1X standards, the IEEE could not have adopted the standards unless Alcatel had first provided the assurances required by the IEEE Bylaws. Alcatel never provided the required assurances. In the case of the '830 patent, Alcatel's assurance was a year-and-one-half late and made without the intention of acting in accordance with it.

67.    Upon information and belief, if the IEEE had not adopted the 802.1X and the 802.1X REV standards, competition and innovation would have continued in the Technology Market at a much faster pace to the benefit of Foundry and other participants in that market. As a result, Foundry would have had more options and lower prices with respect to the user authentication technology for its switches and routers and would have been less susceptible to being held-up by Alcatel. Foundry and other industry participants relied on the integrity of the IEEE standard-setting process and proceeded to make investments in producing and promoting products that were substantially compliant with the 802.1X and 802.1X REV standards. As the 802.1X and 802.1X REV standards became the industry standard, the industry and Foundry became locked-in to the standard.

68.    A negotiated royalty rate for the '830 and '090 patents would have been considerably lower prior to the IEEE's adoption of the 802.1X and 802.1X REV standards than at the time Alcatel filed its patent infringement action against Foundry

after the standards have been widely adopted and Alcatel had gained the monopoly power that it had specifically intended to achieve.

69.    Alcatel's exclusionary conduct included, but was not limited to, deception of the IEEE. It included, upon information and belief, (a) use of information that Alcatel had obtained from its participation in the Working Group to fine tune subsequent patent applications, (b) hold-up litigation after the industry had become locked in to the 802.1X and 802.1X REV standards, and (c) tying practices set forth in the following paragraph. In sum, Alcatel's overall course of conduct , including the circumstances and intent behind its decision not to disclose its patent applications, was exclusionary. It did not constitute competition on the merits, did not generate any efficiencies, and had no pro-competitive justification.

70.    Alcatel tied  (i) its '830 and '090 patents, which Alcatel contends have a scope that renders them essential to practice the 802.1X standards with respect to user authentication to (ii) its other patents that Alcatel does not contend are essential for such practice. Alcatel has thus sought to coerce Foundry into licensing either a package of patents at a supracompetitive royalty rate, or no patents at all. Alcatel has substantial market power in the Technology Market with respect to its '830 and '090 patents and, upon information and belief, engages in a substantial amount of commerce in the markets for its other bundled patents. Upon information and belief, Alcatel's tie put Foundry at a competitive disadvantage vis-à-vis Alcatel and Alcatel licensees against which Foundry competed.

71.    Alcatel's exclusionary conduct made a significant contribution to creating and maintaining its monopoly power in the Technology Market.

72.     Alcatel's unlawful conduct has harmed competition. As the Federal Trade Commission recently noted, "when a firm engages in exclusionary conduct that subverts the standard-setting process and leads to the acquisition of monopoly power, the procompetitive benefits of standard setting cannot be fully realized."

73.     As set forth above, Alcatel has willfully acquired and maintained its monopoly power in the Technology Market, as distinct from acquiring it as a consequence of a superior skill, business acumen or accident.

74.     As evidenced by its exclusionary conduct, Alcatel had the specific intent to monopolize the Technology Market.

75.     Alcatel's exclusionary conduct first damaged Foundry when Alcatel filed suit against Foundry alleging patent infringement. Alcatel's patent infringement suit has caused Foundry to incur legal fees of more than $1 million and it has distracted Foundry from the marketplace, rendering it less competitive, and causing it to suffer lost profits. Alcatel's conduct has also deprived Foundry of the benefits of innovation in the Technology Market.

76.     Foundry has standing to complain about Alcatel's anticompetitive conduct because Foundry is a participant in the Technology Market and a seller of devices that implemented user-authentication technology. Foundry's injuries flow from the anticompetitive aspects of Alcatel's conduct, which include foreclosure of competition in the Technology Market and raising rivals' costs.

77.     As a result of engaging in the conduct set forth above, Alcatel has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

78.     Alcatel's anticompetitive conduct has caused Foundry to suffer injury to its business and property and caused it to incur costs that it otherwise would not have incurred and to suffer lost profits and a slower growth rate.

## COUNT II

### (Common Law Fraud)

79.     Foundry realleges and incorporates by reference each and every allegation set forth above.

80.     By joining the IEEE and/or participating in the standard-setting process, Alcatel voluntarily assumed a duty to the IEEE, its members, and those who Alcatel could reasonably foresee might adopt the 802.1X standard to disclose any patent or patent applications it believed to be related to the standard and to provide the required assurances prior to the IEEE's adoption of the 802.1X standard.  However, Alcatel knowingly and intentionally failed to disclose its '830 patent application or it imminent '090 application or provide the required assurances prior to the IEEE's adoption of the 802.1X standard.

81.     Based on its participation in the 802.1X Working Group and its knowledge of the IEEE's development of a revised standard, Alcatel also had a duty to the IEEE, its members, and those who Alcatel reasonably could foresee might adopt the 802.1X REV standard to disclose any patent or patent applications it believed to be related to the standard and to provide the assurances mandated by the IEEE Bylaws with respect to the '090 patent application prior to the IEEE's adoption of the 802.1X REV standard.  However, Alcatel knowingly and intentionally failed to disclose its '090 patent application or to provide the required assurances prior to the IEEE's adoption of the

802.1X REV standard. Moreover, after the '090 patent was issued, Alcatel did not offer to license the technology covered by its '090 patent to Foundry. .

82.    The '830 patent application and subsequently issued '830 patent as construed by Alcatel are material to practicing the 802.1X standard.

83.    Both the '830 patent and the '090 patent application (and subsequently issued '090 patent) as construed by Alcatel are material to practicing the 802.1X REV standard.

84.    The IEEE and Foundry relied upon Alcatel's failure to disclose its '830 patent application prior to the IEEE's adoption of the 802.1X standard.

85.    The IEEE and Foundry relied upon Alcatel's failure to disclose the '090 patent application prior to the IEEE's adoption of the 802.1X REV standard. Foundry also relied on the integrity of the IEEE's standard-setting process to the extent that Alcatel was required to provide a timely assurance letter regarding the '090 patent application.

86.    Alcatel's January 13, 2003, representation to the IEEE providing assurance that it would license its '830 patent technology on reasonable and nondiscriminatory terms was false and misleading and, upon information and belief, was intended to be so.

87.    As set forth above, Foundry reasonably relied on Alcatel's misconduct, and that reliance was reasonably foreseeable to Alcatel.

88.    Alcatel fraudulently entrapped Foundry by failing to make required disclosures and then injured Foundry when Alcatel sued for patent infringement after Foundry had practiced the IEEE standards, causing Foundry to incur significant costs. To date, Foundry has incurred more than $1 million in legal fees and related expenses.

89.    Alcatel's conduct as set forth above, constitutes common law fraud.

## PRAYER FOR RELIEF

WHEREFORE, Foundry prays that this Court enter judgment:

A.    That Foundry recover its actual and compensatory damages according to proof at trial;

B.    That Foundry's damages be trebled in accordance with the antitrust laws;

C.    That Foundry be awarded pre- and post-judgment interest as permitted by law;

D.    That Alcatel and its agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from any further prosecution of the '830 and '090 patents and any other patents that are alleged to read on the 802.1X standard and/or the 802.1X REV standard;

E.    That Alcatel and its agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from refusing to license to Foundry, on reasonable and non-discriminatory terms, the '830 and '090 patents and any other patents or patent applications that are alleged to read on the 802.1X standard and/or the 802.1X REV standard, on stand-alone bases;

F.    That Foundry be awarded punitive damages;

G.    That Foundry be awarded its reasonable attorneys' fees and costs of suit as allowed by law; and

H.  That the Court grant Foundry such other and further relief as the Court

may deem just and proper.

## JURY DEMAND

Foundry demands a trial by jury as to all issues so triable.

POTTER ANDERSON & CORROON LLP

Of Counsel:

William L. Anthony
Matthew H. Poppe
Michael F. Heafey
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025
650-614-7400


Garret G. Rasmussen
Antony P. Kim
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, D.C. 20007-5135
202-339-8400


Dated:  August 16, 2006
746268

By:_____
    Philip A. Rovner (#3215)
    Hercules Plaza
    P.O. Box 951
    Wilmington, Delaware  19899-0951
    (302) 984-6000
    provner@potteranderson.com

*Attorneys for Plaintiff Foundry Networks, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on August 18, 2006, the within document was filed with the Clerk of the Court using CM/ECF; that the document was served on the following parties as indicated; and that the document is available for viewing and downloading from CM/ECF.

**BY HAND DELIVERY 8/16/06**

Alcatel USA Resources, Inc.
c/o Registered Agent
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**BY HAND DELIVERY 8/17/06**

Alcatel Internetworking, Inc.
c/o CT Corporation System
818 W. 7th Street
Los Angeles, CA 90017

**BY HAND DELIVERY   8/16/06**

Alcatel S.A.
c/o Secretary of State
State of Delaware
Townsend Building
Dover, DE 19901

**BY REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**
**8/16/06**

Alcatel S.A.
54, rue La Boetie
75008, Paris, France

**BY HAND DELIVERY 8/16/06**

Compagnie Financiere Alcatel
c/o Secretary of State
State of Delaware
Townsend Building
Dover, DE 19901

**BY REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**
**8/16/06**

Compagnie Financiere Alcatel
54, rue La Boetie
75008, Paris, France

Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com