## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FOUNDRY NETWORKS, INC.,<br>a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALCATEL USA RESOURCES, INC.<br>a Delaware Corporation,<br>ALCATEL INTERNETWORKING, INC.,<br>a California Corporation,<br>COMPAGNIE FINANCIÈRE ALCATEL<br>a French Corporation, and<br>ALCATEL S.A.,<br>a French Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-470-SLR<br><br><br>(JURY TRIAL DEMANDED) |

## FOUNDRY'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Of Counsel:

William L. Anthony
Matthew H. Poppe
Michael F. Heafey
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400

Garret G. Rasmussen
Antony P. Kim
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, D.C. 20007-5135
(202) 339-8400

Dated: November 22, 2006

Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiff Foundry Networks, Inc.*

## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDING ................................................................1

II.     SUMMARY OF ARGUMENT ...............................................................................1

III.    STATEMENT OF FACTS ......................................................................................2

IV.     ARGUMENT...........................................................................................................6

        A.      Foundry's Antitrust Claim Is Not Time-Barred.............................................7

                1.      The Statute of Limitation Started to Run When Foundry
                        Suffered Injury, Not When Foundry First Learned of
                        Alcatel's Anticompetitive Conduct.................................................7

                2.      Foundry's Allegation that It Did Not Suffer Injury Until
                        June 2005, When Alcatel Sued Foundry for Patent
                        Infringement, Must be Accepted as True for Purposes of
                        Alcatel's Motion to Dismiss. ..........................................................8

                3.      Alcatel's Patent Infringement Suit Caused Independent
                        Injury That Restarted the Statute of Limitations............................10

                4.      The Limitations Period Was Tolled By Alcatel's
                        Purposeful Steps Taken To Mislead Foundry And Delay
                        Suit. ..............................................................................................11

                5.      Foundry's Claim for Injunctive Relief Is Not Barred by
                        Laches. ...........................................................................................13

        B.      Foundry Has Alleged Antitrust Injury Resulting From Alcatel's
                Anticompetitive Conduct. ............................................................................15

                1.      In Evaluating Whether Antitrust Injury Has Occurred, the
                        Court Must Assume That the Alleged Conduct Violates the
                        Antitrust Laws...............................................................................15

                2.      Foundry has Adequately Alleged Antitrust Injury...........................16

                3.      Although Not Raised by Alcatel's Motion to Dismiss,
                        Foundry Has Alleged Facts Sufficient to Establish That
                        Alcatel Violated the Antitrust Laws. .............................................17

        C.      Foundry Has Sufficiently Alleged A Relevant Antitrust Market ...............22

        D.      Foundry's Fraud Claims Are Not Time-Barred...........................................26

CONCLUSION..................................................................................................................28

i

# TABLE OF AUTHORITIES

## CASES

*ALA, Inc. v. CCAIR, Inc ,*
    29 F.3d 855 (3d Cir. 1994)....................................................................................6, 8, 9

*Angelico, M.D. v. Lehigh Valley Hosp. Inc ,*
    184 F.3d 268 (3d Cir. 1999)...........................................................................................15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp ,*
    472 U.S. 585 (1985)........................................................................................................21

*Bechtel v. Robinson,*
    886 F.2d 644 (3d Cir. 1989)..........................................................................................12

*Berkey Photo, Inc. v. Eastman Kodak Co ,*
    603 F2d 263 (2d Cir. 1979).......................................................................................8, 11

*Berlyn v. Gazette Newspapers, Inc ,*
    157 F. Supp. 2d 609 (D. Md. 2001) ..............................................................................23

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982).......................................................................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc ,*
    429 U.S. 477 (1977)................................................................................................15, 16

*Cerbone v. Int'l Ladies' Garment Workers' Union,*
    768 F.2d 45 (2d Cir. 1985)............................................................................................12

*Columbia Steel Casting Co. Inc. v. Portland Gen. Elec. Co ,*
    103 F.3d 1446 (9th Cir. 1996) .........................................................................................8

*Conley v. Gibson,*
    355 U.S. 41 (1957)...........................................................................................................7

*Davis v. Grusemeyer,*
    996 F.2d 617 (3d Cir. 1993)............................................................................................7

*Discovision Assocs. v. Disc. Mfg., Inc ,*
    No 95-21, 1997 WL 309499 (D. Del. Apr. 3, 1997)......................................................26

*Eichorn v. AT&T Corp ,*
    248 F.3d 131 (3d Cir. 2001)..........................................................................................15

*Espino v. Ocean Cargo Line Ltd ,*
    382 F.2d 67 (9th Cir. 1967) ...........................................................................................14

*Fusco v. Xerox Corp.,*
   676 F.2d 332 (8th Cir. 1982) ................................................................................23

*Glus v. Brooklyn E. Dist. Terminal,*
   359 U.S. 231 (1959)...............................................................................11, 12

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
   392 U.S. 481 (1968)......................................................................................10

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984)..........................................................................................7

*Hospitable Bldg. Co. v. Trustees of Rex Hospital,*
   425 U.S. 738 (1976).......................................................................................7

*Hughes v. Rowe,*
   449 U.S. 5 (1980) ............................................................................................6

*Image Technical Services v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) ..............................................................17, 18

*In re Copper Antitrust Litig.,*
   436 F.3d 782 (7th Cir. 2006) ..........................................................................13

*In re Dean Witter P'ship Litig.,*
   No. Civ.A. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998).......................26, 27

*In re Indep. Serv. Orgs. Antitrust Litigation ("ISO"),*
   203 F.3d 1322 (Fed. Cir. 2000)..............................................................18, 20

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
   998 F.2d 1144 (3rd Cir. 1993) ...........................................................2, 10

*In re Rambus, Inc.,*
   No. 9302, 2006 WL 2330117 (F.T.C. August 2, 2006).....16, 17, 18, 19, 21, 22, 26

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.,*
   518 F.2d 913 (9th Cir. 1975) ............................................................................14

*Isaacson v. Artisan's Sav. Bank,*
   330 A.2d 130 (Del. 1974) .............................................................................26

*Klehr v. A.O. Smith Corp.,*
   521 U.S. 179 (1997).................................................................................1, 8

*Knuth v. Erie-Crawford Dairy Co-op. Ass'n,*
   395 F.2d 420 (3d Cir. 1968).............................................................................7

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)................................................................................7

*Mantilla v. United States*,
   305 F.3d 182 (3rd Cir. 2002) .........................................................................14

*Melhorn v. AMREP Corp.*,
   373 F. Supp. 1378 (M.D. Pa. 1974) ..............................................................12

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
   38 F.3d 1380 (3d Cir. 1994).......................................................................7, 11

*Ott v. Midland-Ross Corp.*,
   523 F.2d 1367 (6th Cir. 1975) ..................................................................12, 13

*Ott v. Midland-Ross Corp.*,
   600 F.2d 24 (6th Cir. 1979) ...........................................................................13

*Pace Indus., Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) .......................................................................1, 10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*
   124 F.3d 430 (3d Cir. 1997)......................................................................25, 26

*Sanchez v. Loffland Bros. Co.*,
   626 F.2d 1228 (5th Cir. 1980) .......................................................................12

*Sandvik v. Alaska Packers Ass'n*,
   609 F.2d 969, 673 (9th Cir. 1979) ................................................................14

*Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997)...........................................................................15

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir.)..................................................................................24

*Standard Oil Co. v. United States*,
   283 U.S. 163 (1931)........................................................................................17

*Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999)...........................................................................15

*Todd v. Exxon*,
   275 F.3d 191 (2d Cir. 2001).................................................................2, 24, 25

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992)...........................................................................25

*U.S. Philips Corp. v. Int'l Trade Commission,*
    424 F.3d 1179 (Fed. Cir. 2005)...........................................................................20

*United States v. Line Materials Co.,*
    333 U.S. 287 (1948)...........................................................................................17

*United States v. Masonite Corp.,*
    316 U.S. 265 (1942)...........................................................................................17

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001)........................................................................18, 22

*United States v. Reliance Ins. Co.,*
    436 F.2d 1366 (10th Cir. 1971) ........................................................................12

*United States v. United States Gypsum Co.,*
    333 U.S. 364 (1948)...........................................................................................17

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,*
    860 A.2d 312 (Del. 2004) ..................................................................................27

*Wang Labs, Inc. v. Mitsubishi Elec. Am., Inc.,*
    103 F.3d 1571 (Fed. Cir. 1997).........................................................................19

*Weinberger v. Retail Credit Co.,*
    498 F.2d 552 (4th Cir. 1974) .............................................................................14

*Wolin v. Smith Barney, Inc.,*
    83 F.3d 847 (7th Cir. 1996) ...............................................................................13

*Zenith Radio Corp. v. Hazeltime Research, Inc.,*
    401 U.S. 321 (1971)...........................................................................................11

## STATUTES

Sherman Act, 15 U.S.C. § 1 .......................................................................................15

Sherman Act, 15 U.S. C. § 2 ............................................................................1, 15, 18

Clayton Act § 4B, 15 U.S.C. § 15b...................................................................13, 14

U.S. Department of Justice and Federal Trade Commission Merger Guidelines, 4
Trade Reg. Rep. (CCH) ¶ 13,104..............................................................................25

# MISCELLANEOUS

Areeda & Hovenkamp, ANTITRUST LAW (2d ed. 2002) ............................2, 8, 14, 15, 23, 26

H. Hovenkamp, et al., IP AND ANTITRUST (2006 ed.)............................15, 16, 18, 19, 21, 22

Letter from B.C. Johnson, President, IEEE-SA, to Donald S. Clark in the FTC
    Office of the Secretary (April 17, 2002), available at:
    http://www.ftc/gov/os/comments/intelpropertycomments/ieee.pdf........................22

WRIGHT & MILLER, FEDERAL PRAC. & PROC. §1228 (2d ed. 1990) ...................................23

## I.    NATURE AND STAGE OF PROCEEDING

Plaintiff Foundry Networks, Inc. ("Foundry") filed its original Complaint (D.I. 1.)

on August 1, 2006 and an Amended Complaint (D.I. 20) on August 16, 2006. The

Amended Complaint alleges that Defendants violated Sherman Act § 2, 15 U.S.C. § 2,

and committed common law fraud. Defendants in the action are Alcatel S.A. ("Alcatel

(France)"), Compagnie Financière Alcatel ("CFA"), Alcatel USA Resources, Inc.

("Alcatel Resources"), and Alcatel Internetworking, Inc. ("AII"). On October 11, 2006,

Alcatel (France) and CFA moved under Rule 12(b)(2) for lack of personal jurisdiction

(D.I. 31), and all Defendants (collectively herein, "Alcatel" or "Defendants") moved

under Rule 12(b)(6) for failure to state a claim (D.I. 36).[1]

## II.    SUMMARY OF ARGUMENT

In its motion to dismiss the Amended Complaint, Alcatel relies on three principal

arguments. First, Alcatel argues that the statute of limitations has run because Foundry

"had actual knowledge" of Alcatel's illegal concealment of its patent applications more

than four years before Foundry filed this suit. (D.I. 36 at 2.) However, as discussed

below, the statute of limitations only starts to run when the plaintiff is *injured* by an

antitrust violation, not when the plaintiff first *learns* of the violation. *Klehr v. A.O. Smith

Corp.*, 521 U.S. 179, 188-91 (1997) (injury starts limitations period "regardless of the

plaintiff's knowledge of the alleged illegality at much earlier times"). Moreover, the

limitations period restarts with additional injuries caused by each overt act of illegal

conduct. *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).

Thus, even assuming there were earlier injuries, Foundry's antitrust claim is timely since

---

[1]    Foundry is filing a separate answering brief in response to the 12(b)(2) motion.

it was filed within four years of the injury Foundry suffered when Alcatel filed its patent infringement action against Foundry in June 2005. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1171-72 (3d Cir. 1993).

Second, Alcatel argues that Foundry lacks antitrust standing because Foundry allegedly suffered no "antitrust injury." (D.I. 36 at 2.) However, Alcatel improperly conflates "antitrust injury" with liability on the merits. As a matter of law, in assessing antitrust injury, courts must assume that the alleged misconduct violated the antitrust laws and then determine whether the plaintiff's injury was caused by anticompetitive effects flowing from that assumed violation. *See* 2 Areeda & Hovenkamp, ANTITRUST LAW ¶335f at 221 (2d ed. 2002). Here, as discussed below, Foundry has properly alleged injuries that flow from the anticompetitive effects of Alcatel's assumed antitrust violation.

Third, Alcatel argues that Foundry inadequately pled an antitrust market. (D.I. 36 at 3.) However, Foundry has expressly pled a properly-defined, economically plausible antitrust market. (D.I. 20 at Intro; ¶51.) Contrary to Alcatel's assertions, Foundry is not required to plead *all* of the facts that *prove* its market definition. *See Todd v. Exxon*, 275 F.3d 191, 200 (2d Cir. 2001).

## III.    STATEMENT OF FACTS

The Institute of Electrical and Electronics Engineers ("IEEE") is a New York corporation and the leading developer of standards that underpin many aspects of the computer industry in the United States, with more than 300,000 members. (D.I. 20 at ¶ 14.) Standards set by the IEEE significantly impact the computer market in this country and commercial entry into that market. (*Id.* at ¶ 15). For example, the IEEE's 802.1X

2

and 802.1X REV standards establish industry-wide authentication protocols governing port-based network access to computer networks called "LANs." (*Id.* at ¶¶ 20, 27, 33-36.) Because of network effects, companies like Foundry must comply with the IEEE's 802.1X and 802.1X REV standards to compete in the relevant market alleged here — the technology market for user authentication for port-based network access to LANs. (*Id.* at Intro.; ¶¶34, 35, 54.)

User authentication for port-based network access to LANs is a process by which an individual seeks access to resources on a computer network by validating that he or she is authorized to have such access. (*Id.* at Intro.) Alcatel dominates that market and exercises market power in it. (*Id.* at ¶¶ 51, 52.) The market has high entry barriers, and is subject to network effects which makes switching to other technologies virtually impossible as a practical matter. (*Id.* at ¶¶ 53, 54, 55.)

To prevent unfair competitive advantage in the marketplace, the IEEE Bylaws require participants in the standard-setting process to disclose known patent applications and patents required to practice a standard under consideration, and to grant assurances – either that the patent applications and patents will not be enforced or alternatively will be licensed on reasonable non-discriminatory ("RAND") terms -- *before* the IEEE adopts the standard. (D.I. 20. at ¶¶ 16-17.) The Bylaws also require a reaffirmation of these assurances when a patent application or patent becomes known after a standard is adopted. (*Id.*)

As a member and/or participant in the IEEE and the 802.1 Working Group, Alcatel had a duty to comply with the Bylaws with respect to the development of the IEEE 802.1X and 802.1X REV standards at issue in this case. (D.I. 20 at ¶¶ 19, 80.)

Despite this duty, Alcatel intentionally failed to disclose and grant assurances with respect to its '830 and '090 patent applications before the IEEE adopted the 802.1X and 802.1X REV standards in 2001 and 2004, respectively. (*Id.* at ¶¶ 61, 63-64.)

If the IEEE had been aware of Alcatel's patent applications and of Alcatel's contention that the resulting patents had a scope that rendered them essential to user-authentication technology that conforms to the 802.1X standard, then, according to the IEEE's Bylaws, the IEEE would not have been able to include Alcatel technology in the 802.1X standard unless Alcatel had first provided RAND assurances and an opportunity for licensing negotiations prior to the IEEE's adoption of the standard. (*Id.* at ¶ 31.)

The IEEE adopted the 802.1X standard on June 14, 2001. (D.I. 20 at ¶ 31.) At that time, Alcatel had a patent application (filed on March 15, 2000) pending which later matured into the '830 patent. (*Id.* at ¶ 21.) Alcatel participated in the IEEE working group that devised the 802.1X standard. (*Id.* at ¶22.) However, Alcatel never disclosed the existence of the patent application. (*Id.* at ¶24.)

Within a year of its adoption, the 802.1X standard became the industry standard for user authentication for port-based network access. (*Id.* at ¶ 32.) Thus, industry members had to conform to the standard in order to compete in the relevant market. (*Id.* at ¶ 34.) In essence, they were "locked-in" to the standard and could not switch to other technologies.

Like other industry participants, Foundry made a significant sunk-cost investment to implement the 802.1X standard in its products. (D.I. 20. at ¶ 36.) In doing so, Foundry relied upon the integrity of the IEEE standard-setting process, and its reasonable understanding – based on Alcatel's failure to disclose any patent applications or patents

4

prior to the implementation of the 802.1X standard – that it could practice the standard without being held-up by Alcatel for supracompetitive royalty claims. (*Id.*)

On January 15, 2002, Alcatel's '830 patent application (which had been pending when the IEEE adopted the 802.1X) matured into the '830 patent entitled *Deterministic User Authentication Service for Communication Network.* Alcatel did not disclose the issuance of that patent to either the IEEE or Foundry at the time, nor did it offer at that time any licensing assurances regarding the technology covered by the '830 patent. (*Id.* at ¶ 37.)

In April 2002, Alcatel for the first time disclosed to Foundry the existence of the '830 patent. (D.I. 20 at ¶ 38.) However, Foundry was not concerned because it reasonably believed, based on the duties set forth in the IEEE Bylaws and on Alcatel's participation in the standard-setting process, that Alcatel could not enforce the patent against it. (*Id.* at ¶ 39.)

On January 13, 2003, more than one-and-a-half years after the IEEE had adopted the 802.1X standard, Alcatel belatedly informed the IEEE of its '830 patent and of its purported willingness to license the '830 patent on reasonable and non-discriminatory terms. (D.I. 20 at ¶ 40.) Notwithstanding Alcatel's purported willingness to voluntarily license the technology that it now claims is essential to practicing the 802.1X standard, Alcatel did not offer, and still has not offered, reasonable, non-discriminatory, unbundled licensing terms to Foundry for '830 patent rights. (*Id.* at ¶ 41.)

However, to lull the IEEE and Foundry into believing that reasonable licenses might be available per the IEEE patent policy (albeit belatedly), Alcatel engaged in

licensing negotiations with Foundry, which ultimately failed. Alcatel never offered
reasonable, non-discriminatory licensing terms to Foundry. (*Id.* at ¶ 38, 41.)

In 2004, the Alcatel adopted a revised standard known as 802.1X REV which also
pertains to user authentication for port-based network access to LANs. (*Id.* at ¶ 43.) At
the time, IEEE had a patent application (filed in June 2001) pending that later matured
into the '090 patent. (*Id.* at ¶28.)  However, Alcatel failed to disclose the existence of its
patent application prior to the IEEE's adoption of the 802.1X REV standard. (*Id.* at ¶
43.) On March 29, 2005, the U.S. Patent Office issued the '090 patent. (*Id.* at ¶ 44.)

On June 21, 2005, Alcatel USA Resources and AII sued Foundry in the U.S.
District Court for the District of Delaware, alleging that Foundry had infringed the '830
and '090 patents by selling products that incorporated user-authentication technology that
conform to the 802.1X standard and the 802.1X REV standard. (D.I. 20 at ¶ 45.) This
was the first time that Alcatel's deceptive conduct caused injury to Foundry. (*Id.* at ¶ 75.)

Alcatel took each of the foregoing steps to surreptitiously lock-in its patents into
industry-wide IEEE standards and to set up subsequent hold-up patent infringement suits
like the one filed against Foundry in June 2005, in which it alleges that Foundry's mere
practice of IEEE standards violates the '830 and '090 patents. (*Id.* at ¶¶ 28, 30, 69.)
Foundry was thus damaged by Alcatel's anticompetitive conduct in June 2005 when
Alcatel filed its infringement suit. (*Id.* at ¶ 75.)

## IV.    ARGUMENT

On a motion to dismiss, "the court must consider only those facts alleged in the
complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d
855, 859 (3d Cir. 1994); *see also Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (requiring

6

ambiguities to be construed in plaintiff's favor). Moreover, the Court "should be extremely liberal in construing antitrust complaints." *Knuth v. Erie-Crawford Dairy Co-op. Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968).

Dismissal is improper unless it is "beyond doubt" that no set of facts support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957). Indeed, dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Moreover, "[i]n antitrust cases . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Lum v. Bank of Am.,* 361 F.3d 217, 228 (3d Cir. 2004) (quoting *Hospitable Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746 (1976)). As discussed below, there is no basis for dismissing Foundry's complaint.

## A.    FOUNDRY'S ANTITRUST CLAIM IS NOT TIME-BARRED

Alcatel bears a particularly "heavy burden" to show that Foundry's claims are time-barred as a matter of law. *See Davis v. Grusemeyer*, 996 F.2d 617, 623 (3d Cir. 1993). To prevail, Alcatel must establish that the Amended Complaint "facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) (citation omitted). As set forth below, Alcatel has failed to do so.

### 1.    The Statute of Limitations Started to Run When Foundry Suffered Injury, Not When Foundry First Learned of Alcatel's Anticompetitive Conduct.

Alcatel makes much of the fact that Foundry learned of Alcatel's concealment of the '830 patent more than four years before filing suit. However, that fact is irrelevant. The limitations period started to run when Foundry was *injured*, not when it first *learned*

7

of Alcatel's anticompetitive conduct. *See Klehr,* 521 U.S. at 188-91. In *Berkey Photo,*

the Second Circuit explained the rationale for the time-of-injury rule:

> Untoward consequences would follow were we to hold that
> the anticompetitive conduct itself triggered the running of
> the limitations period. . . . Plainly, at the time a monopolist
> commits anticompetitive conduct it is entirely speculative
> how much damage that action will cause its purchasers in
> the future. . . . Not until the monopolist actually sets an
> inflated price and its customers determine the amount of
> their purchases can a reasonable estimate [of damages] be
> made. The purchaser's cause of action, therefore, accrues
> only on the date damages are 'suffered.'

603 F.2d 263, 295 (2d Cir. 1979). *See also Columbia Steel Casting Co., Inc. v. Portland*

*Gen. Elec. Co.,* 103 F.3d 1446 (9th Cir. 1996), *amended on reh'g,* 111 F.3d 1427 (9th

Cir. 1996) (holding that the statute of limitations started to run when the utility refused

defendants' request for service, not when it entered into an unlawful agreement not to

compete in a particular area); 2 Areeda, *supra,* at ¶ 320d ("[W]hen the defendant commits

an antitrust violation at time T1 but the plaintiff suffers no injury at all until time T2, the

statute runs from the latter time.").

> ## 2.    Foundry's Allegation that It Did Not Suffer Injury Until June
> 2005, When Alcatel Sued Foundry for Patent Infringement,
> Must be Accepted as True for Purposes of Alcatel's Motion to
> Dismiss.

Based on the time-of-injury rule applicable to antitrust cases, Alcatel cannot

prevail on its motion to dismiss. The Amended Complaint expressly alleges that

"Alcatel's exclusionary conduct *first damaged* Foundry when Alcatel filed suit against

Foundry alleging patent infringement." (D.I. 20 at ¶ 75) (emphasis added). This

allegation is a specific, factual allegation, not a "bald assertion" or a "legal conclusion" as

Alcatel asserts. (D.I. 36 at 13.) Accordingly, it must be taken as true on a motion to

dismiss. *See ALA,* 29 F.3d at 859.

Alcatel speculates that Foundry suffered earlier injuries, asserting that in April

2002 Foundry "incurred legal expenses . . . when it responded to Alcatel's licensing

demand." (D.I. 36 at 13.)  However, Foundry's Complaint contains no such allegation,

and Alcatel cannot rewrite Foundry's Complaint or assume facts that Foundry did not

plead. *See ALA,* 29 F.3d at 859 (only plaintiff's allegations are considered on a motion to

dismiss).  Indeed, the Amended Complaint alleges that when Foundry first learned in

2002 that Alcatel had failed to disclose the '830 patent to the IEEE, Foundry

subsequently told Alcatel that Alcatel could not enforce the '830 patent against Foundry –

*i.e.,* it could *not* injure Foundry – due to Alcatel's violation of duties under the IEEE's

patent policy. (D.I. 20 at ¶¶ 38-39.)

Alcatel cites a "litany" of injuries that it asserts Foundry suffered before Alcatel

filed its patent infringement suit. (D.I. 36 at 12-13.)  In particular, Alcatel cites the

Amended Complaint's allegations that Alcatel's conduct prevented Foundry (i) from

"assess[ing] the costs and benefits of the [802.1X] standard before adopting it (ex ante)",

(ii) from "negotiat[ing] royalties ex ante, before Alcatel's patents were locked in" (iii)

from making investments that it otherwise might not have made and (iv) from obtaining

the benefits of competition. (*Id.*)  However, *all* of the events cited by Alcatel *only* started

to injure Foundry *once* Alcatel filed its infringement action against Foundry in June 2005.

(*See* D.I. 20 at ¶ 75.)  If Alcatel had not sought to enforce its patents by suing Foundry:

(i) Foundry would have had no need to take those patents into account when "assess[ing]

the costs and benefits of the standard"; (ii) Foundry would not have had to "negotiate

royalties" for the patents; (iii) Foundry would not have suffered from the investments it

had made to implement the 802.1X standard; and (iv) Foundry would not have been

deprived of the benefits of competition because it would have faced a level playing field in the technology market for port-based authentication. In sum, the statute of limitations did not start to run until June 2005 when Alcatel filed its patent infringement action against Foundry.[2]

### 3. Alcatel's Patent Infringement Suit Caused Independent Injury That Restarted the Statute of Limitations.

Even if the statute of limitations had started to run in April 2002, it restarted on June 21, 2005 with the filing of Alcatel's patent infringement suit, which imposed significant costs on Foundry. As a matter of law, each time a plaintiff is injured, the statute of limitations starts to run again. *See Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ([a] cause of action in antitrust accrues each time a plaintiff is injured"); (*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) (holding that even if overt act which demonstrates the antitrust violation occurs outside the statute of limitations period, an injurious act within the limitations period may serve as the basis for a timely antitrust suit). *Accord Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (holding that statute of limitations does not bar recovery where defendant's unlawful conduct "inflicted continuing and accumulating harm"). Indeed, Alcatel acknowledges that the statute of limitations can be restarted with subsequent injuries. (*See* D.I. 36 at 11.)

Alcatel's filing of its patent-infringement complaint on June 21, 2005 restarted the statute of limitations because it inflicted "new and accumulating injury on the plaintiff." *See Pace, supra*, at 237 (filing of a suit to enforce an allegedly illegal restrictive covenant

---

[2]    Because Foundry's claims regarding Alcatel's abuse of its '830 patent are timely, so are Foundry's claims relating to the later-issued '090 patent. In both cases, Foundry was first harmed when Alcatel filed patent-infringement litigation against it.

constitutes an "overt act" that restarts the statute of limitations). Here, as alleged in the Amended Complaint, Alcatel illegally set a trap for Foundry, and once Foundry was locked-in, Alcatel injured Foundry by springing the trap and embroiling Foundry in an expensive patent-infringement litigation, seeking to hold Foundry up for supracompetitive royalties. (*See* D.I. 20 at Intro.) To be clear, Foundry is not alleging that the patent-infringement suit was an independent antitrust violation, but rather that it was part of the injury that Foundry suffered as a result of Alcatel's illegal conduct.

In sum, as the Second Circuit noted in *Berkey Photo*, "[s]o long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide." 603 F.2d at 295. Accordingly, this case is timely, and Alcatel's motion must be denied.

### 4. The Limitations Period Was Tolled By Alcatel's Purposeful Steps Taken To Mislead Foundry And Delay Suit.

Even if the statute of limitations had started to run in April 2002, and had never restarted, the Amended Complaint still would be timely because of the doctrine of equitable-estoppel. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1389-91 (3d Cir. 1994).[3] The equitable-estoppel doctrine prevents a defendant whose representations or other conduct have caused the plaintiff to delay filing suit until after the running of the statutory period from asserting that bar to the action. *See Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 233-4 (1959). According to the Third Circuit,

---

[3]    Alcatel's argument (D.I. 31 at 8 n.5) that the Amended Complaint contains no allegation of tolling is of no moment. "[W]here, as here, a plaintiff has no reason to anticipate that a claim of limitations will be raised against him, he need not set forth his claim of tolling until the limitations claim is raised." *Zenith Radio Corp. v. Hazeltime Research, Inc.,* 401 U.S. 321, 334 (1971).

> Equitable estoppel in the modern sense arises from the *conduct* of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Bechtel v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989) (Higginbotham, J.) (citing 3 S. Symons, *Pomeroy's Equity Jurisprudence* § 802 (5th ed. 1941)) (emphasis in original). *See also Sanchez v. Loffland Bros. Co.*, 626 F.2d 1228, 1231 (5th Cir. 1980) (citing *Glus, supra*).

Misleading settlement negotiations can toll the statute of limitations by "lull[ing] the plaintiff into believing that it was not necessary for him to commence litigation." *Cerbone v. Int'l Ladies' Garment Workers' Union,* 768 F.2d 45, 50 (2d Cir. 1985) (citing *Glus, supra*). *See also Melhorn v. AMREP Corp.*, 373 F. Supp. 1378, 1381 (M.D. Pa. 1974) (citing *United States v. Reliance Ins. Co.*, 436 F.2d 1366, 1370 (10th Cir. 1971)). For example, in *Ott v. Midland-Ross Corp.*, 523 F.2d 1367 (6th Cir. 1975), the court denied a motion to dismiss because plaintiff's delay in filing suit was based on his reliance on defendant's apparent willingness to settle. The *Ott* court reasoned:

> Liberally construed, the complaint indicates that the plaintiff may be able to prove facts which would estop the defendant from asserting the statute of limitations. Of course, whether the plaintiff will actually be able to prove such facts, and the other allegations of his complaint, is another matter altogether.

523 F.2d at 1370.

Here, Alcatel's January 13, 2003, letter to the IEEE offering to license its '830 patent is analogous to a settlement negotiation. (D.I. 20 at ¶40.) Foundry relied on

Alcatel's letter, believing that Alcatel would in fact offer a license to Foundry on reasonable, non-discriminatory terms based on market conditions prior to the IEEE's adoption of the 802.1X standard ("ex ante").[4] (*Id.* at ¶¶ 41, 65, 86, 87.) Thus, as was the case in *Ott*, the Amended Complaint "indicates that [Foundry] may be able to prove facts which would estop [Alcatel]" from asserting a statute of limitations defense. *See Ott*, 523 F.2d at 1370.

Under the equitable estoppel doctrine, the plaintiff gets the benefit of "the full statutory period in which to sue after the estoppel has ceased to impede him." *Wolin v. Smith Barney, Inc.*, 83 F.3d 847, 852-53 (7th Cir. 1996); *Ott v. Midland-Ross Corp.*, 600 F.2d 24, 33 (6th Cir. 1979) (plaintiff "entitled to full amount of time allowed by Congress for the commencement of his action, undiminished by any period of time in which it might appear that he was unlawfully induced to forego commencing his action by the unfair and inequitable conduct of [defendant]"); *In re Copper Antitrust Litig.*, 436 F.3d 782, 790 (7th Cir. 2006). Because Alcatel's letter informing the IEEE of Alcatel's purported willingness to license the '080 patent was submitted to the IEEE less than four years before this case was filed, this case is timely.

### 5.    Foundry's Claim For Injunctive Relief Is Not Barred by Laches.

The Clayton Act's four-year statute of limitations applies only to claims for damages. *See* 15 U.S.C. § 15b. There is no express limitation period on claims for injunctive relief. Accordingly, some courts have used the four-year period to determine

---

[4]    It is immaterial whether Alcatel *intended* its conduct to induce Foundry to delay filing suit until after the statute of limitations had run. As long as (i) Alcatel's conduct taken as a whole lulled Foundry into inaction and (ii) Foundry clearly and justifiably relied in good faith on Alcatel's conduct in foregoing the filing of a lawsuit, Alcatel is estopped from claiming a statute of limitations defense. *See Ott*, 600 F.2d at 31.

an appropriate laches period. *See Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 928 (9th Cir. 1975) ("The proper approach is to use [Clayton Act § 4B's] four-year limitation on [damages] actions as a guideline in computing the laches period under [the injunctive relief provision]."). Other courts have permitted antitrust suits seeking injunctive relief to proceed even where filed after the four-year period for damage actions. *See Weinberger v. Retail Credit Co.*, 498 F.2d 552, 556 (4th Cir. 1974) (dismissing Clayton Act claim for damages based on statute of limitations "[w]ithout regard to [plaintiff's] standing to sue under sections 4 and 16 of the Clayton Act," which authorize awards of injunctive relief); 2 Areeda, *supra*, at ¶ 320g (noting that a plaintiff can in some cases seek an injunction after the statute of limitations has run and that laches is "less likely where the requested equity relief is merely prospective"). Either way, Foundry's request for injunctive relief is timely.

Since the statute of limitations has *not* run, as discussed above, Alcatel's laches argument is a non-starter. *See Mantilla v. United States*, 302 F.3d 182, 186 (3d Cir. 2002) ("Because [the plaintiff's] claim survives the statute of limitations, the equitable defense of laches is presumptively inapplicable.") (citation omitted).

In any event, the issue of laches – like the statute of limitations issue – is fact-based and should not be resolved on a motion to dismiss. *See Sandvik v. Alaska Packers Ass'n,* 609 F.2d 969, 674 (9th Cir. 1979) ("where laches is raised as a defense 'the factual issues involved . . . can rarely be resolved without some preliminary evidentiary inquiry.'") quoting *Espino v. Ocean Cargo Line Ltd.*, 382 F.2d 67, 70 (9th Cir. 1967).

**B.    FOUNDRY HAS ALLEGED ANTITRUST INJURY RESULTING FROM ALCATEL'S ANTICOMPETITIVE CONDUCT.**

In order to state a claim under Sherman Act § 2, a plaintiff must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury "should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn,* 248 F.3d at 140. As with the statute of limitations, the existence of antitrust injury is an issue of fact "not typically resolved through motions to dismiss." *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997).

**1.    In Evaluating Whether Antitrust Injury Has Occurred, the Court Must Assume That the Alleged Conduct Violates the Antitrust Laws.**

In its memorandum, Alcatel improperly conflates antitrust injury with antitrust liability. (D.I. 36 at 15-19.) However, "[t]o test standing in a private suit . . . the court should *assume* the existence of a violation and then ask whether the [standing elements, including antitrust injury ] are shown." 2 Areeda, *supra*, at ¶335f (emphasis added). *See also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.7 (3d Cir. 1999). *Accord* H. Hovenkamp, et al., IP AND ANTITRUST § 6.2b3 (2006 ed.) (the antitrust-injury requirement means "that even if there is an antitrust violation and injury-in-fact, plaintiffs can recover only for the anticompetitive consequences of the defendant's act."). Accordingly, in *Angelico, M.D. v. Lehigh Valley Hosp. Inc.*, 184 F.3d 268, 275 n.2 (3d Cir. 1999), the Third Circuit held that the district court had "erred by … confusing antitrust injury with an element of a claim under section one of the Sherman

15

Act, 15 U.S.C. § 1.") (Citation omitted.) Alcatel invites this Court to make the same error.

## 2.    Foundry Has Adequately Alleged Antitrust Injury.

Foundry has alleged injuries flowing from the anticompetitive effects of the alleged misconduct. As the Federal Trade Commission ("FTC") found in *In re Rambus, Inc.*, No. 9302, 2006 WL 2330117 (F.T.C. August 2, 2006),[5] the anticompetitive effect of deception in standard setting is that "[i]ndustry members find themselves 'locked in' to the standardized technology once switching costs become prohibitive," and, once that occurs, "the owner of the standardized technology may be able to 'hold up' the industry and charge supracompetitive rates." This is precisely the injury that Foundry has alleged. (*See* D.I. 20 at ¶¶ 34, 35, 36, 76.)

Alcatel's reliance on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477 (1977), is misplaced. There, the plaintiff-bowling alley sued to prevent defendant Brunswick from acquiring and reviving plaintiff's languishing competitor. Plaintiff's complaint was that, but for the merger, its rival would have gone out of business and plaintiff could have earned higher profits. As the Supreme Court held, the plaintiff's injury did not result from any anticompetitive aspect of the merger, and thus did not constitute antitrust injury. In essence, the plaintiff was improperly seeking to use the antitrust laws to protect it from the very competition that the antitrust laws are intended to foster. *See* H. Hovenkamp, *supra*, at § 6.2b3. Here, in contrast, Foundry's injury results from the *anticompetitive* aspects of Alcatel's conduct – higher prices and reduced choice

---

[5]    An electronic copy of "Public Record Version" is available at the FTC's website: http://www.ftc.gov/os/adjpro/d9302/ (last accessed November 20, 2006). All page citations in this brief are to this version of the opinion.

– the very things the antitrust laws are intended to prevent. *See Rambus, supra.* "An

increase in price resulting from the dampening of competitive market forces[,] is

assuredly one type of injury for which § 4 [of the Clayton Act, which provides for treble

damages] potentially offers redress." *Blue Shield of Va. v. McCready,* 457 U.S. 465, 482-

83 (1982) (Citation omitted.) Accordingly, Foundry has adequately alleged antitrust

injury.

**3.      Although Not Raised by Alcatel's Motion to Dismiss, Foundry
Has Alleged Facts Sufficient to Establish That Alcatel Violated
the Antitrust Laws.**

Rather than assuming antitrust liability and then assessing the nature of Foundry's

alleged injury, Alcatel argues that there is no liability and thus there can be no injury.

(D.I. 36 at 15 *et seq.*). Not only is Alcatel's antitrust-injury analysis backwards, but its

analysis of antitrust liability is wrong as a matter of law.

Alcatel incorrectly asserts that a patent holder can *only* violate the antitrust laws

by engaging in "illegal tying, fraud in the Patent and Trademark Office, or sham

litigation." (*See* D.I. 36 at 16.) However, a patent holder can violate the antitrust laws in

any number of different ways. *See e.g., United States v. Line Materials Co.,* 333 U.S.

287 (1948) (patent holder violated antitrust laws by cross licensing); *Standard Oil Co. v.

United States,* 283 U.S. 163 (1931) (patent holder's requirement that licensees share

sublicense royalties with patent holder could violate the rule of reason); *United States v.

Masonite Corp.,* 316 U.S. 265, 277 (1942) (restrictions imposed in a patent license can

violate the antitrust laws); *United States v. United States Gypsum Co.,* 333 U.S. 364

(1948) (patent holder not immune from liability for unlawful price fixing); *Image

Technical Services v. Eastman Kodak Co.,* 125 F.3d 1195 (9th Cir. 1997), *cert. denied,*

17

523 U.S. 1094 (1998) (recognizing that a firm that had not engaged in tying, improper

infringement suits, or any other patent 'misuse' could nevertheless violate the antitrust

laws).[6] *See also United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001)

(contractual restrictions on modification of Windows operating system held to violate

Sherman Act § 2). Indeed, patent holders can violate the antitrust laws in so many ways

that the leading treatise on antitrust and patents consumes two volumes. *See* H.

Hovenkamp, *supra.*

In *Rambus*, the FTC held that Rambus had violated both the FTC Act and

Sherman Act § 2 when it failed to disclose its patents to a standard-setting body and

subsequently held up the computer memory industry that had adopted the standard.

*Rambus, supra,* at 3. The FTC described Rambus' conduct as follows:

> Rambus was able to conceal its patents and patent
> applications until after the standards were adopted and the
> market was locked in. Only then did Rambus reveal its
> patents – through patent infringement lawsuits against
> JEDEC [the standard-setting organization] members who
> practiced the standard.

*Id.* at 4-5. The FTC expressly found that such conduct was exclusionary and that "when

a firm engages in exclusionary conduct that subverts the standard-setting process and

leads to the acquisition of monopoly power, the procompetitive benefits of standard

setting cannot be fully realized." *Id.* at 3. The FTC further found that such conduct has

"grave implications for competition," "thwarts informed choice," and "is not competition

on the 'basis [of] efficiency.'" *Id.* at 3, 36.

---

[6]     Although the Ninth Circuit went further and held that a unilateral refusal to
license a patent can also violate the antitrust laws, the Federal Circuit rejected that view
in *In re Indep. Serv. Orgs. Antitrust Litigation* ("ISO"), 203 F.3d 1322, 1327 (Fed. Cir.
2000), *cert. denied*, 531 U.S. 1143 (2001), discussed *infra*. Foundry relies on *Kodak* only

The FTC also recognized that the anticompetitive effects of Rambus' deception allowed Rambus to expand its monopoly beyond that granted by Congress. "A patent holder's market power may be materially enhanced once the patented technology is incorporated into a standard, as alternatives become less attractive relative to the chosen technology and less able to constrain its price." *Id.* at 35. As a result, the patent holder may be able to charge "excessive royalties." *Id.* The same is true here.

Alcatel suggests (and hopes) that the FTC decision in *Rambus* will be reversed. (*See* D.I. 36 at 22-23.) However, the FTC's decision is fully consistent with the analysis set forth in the leading treatise on antitrust law and patents. *See* H. Hovenkamp, *supra*, § 35.5b at 35-40 n.17.11 (noting that a rule that immunized patent holders from antitrust liability in the standard-setting process would be "misguided" and would "render standard-setting organization (SSO) rules requiring disclosure of intellectual property largely worthless"). *See also Wang Labs, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580-82 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 818 (patent holder estopped from asserting patent rights in a standard that it had encouraged the public to adopt).

Alcatel attempts to distinguish *Rambus* by arguing that *Rambus* involved "issued patents" as opposed to patent applications. (D.I. 36 at 23.) However, as the leading IP-Antitrust treatise states, that difference "should not change the analysis." H. Hovenkamp, *supra*, § 35.5b at 35-41 n.18. Indeed, the IEEE patent policy explicitly refers to and mandates the disclosure and granting of assurances on "patents, *including* patent *applications.*" (D.I. 20 at ¶ 16.) (emphasis added).

---

for the more limited proposition citied above with which the Federal Circuit does not disagree.

Alcatel also argues that Rambus' conduct involved acts of deception that "far exceed the passive failure to disclose alleged of Alcatel." (D.I. 36 at 24.) However, this assertion mischaracterizes and diminishes the nature of Alcatel's misconduct. Alcatel did not merely "passively fail to disclose" information. As alleged in the Amended Complaint, Alcatel repeatedly misled both the IEEE and industry participants regarding the nature of its patent rights, actively encouraged the use of technology in IEEE standards that it intended to be covered by its patents, disingenuously offered to license its patent rights on reasonable and nondiscriminatory terms, and filed hold-up patent infringement suits against entities such as Foundry. (*See* D.I. 20 at Intro.; ¶¶ 16, 22-26, 29-30, 34, 36, 40, 45, 47-48, 58, 61, 65, 69, 75.) Thus, like Rambus, Alcatel has violated the antitrust laws.

Alcatel's reliance on *In re ISO* is misplaced. *ISO* merely holds that a simple *unilateral* refusal to license – untainted by other exclusionary conduct – cannot violate the antitrust laws. *See* 203 F.3d at 1326. While *ISO* recognizes that tying, sham litigation, and fraud in the Patent and Trademark Office can violate the antitrust laws, it does not limit patent abuses to these categories.[7] Indeed, it recognized that "[i]ntellectual

---

[7]    Although not necessary to Foundry's Sherman Act § 2 claim, Foundry has alleged tying conduct as among the additional anticompetitive conduct in which Alcatel engaged. (D.I. 20 ¶¶ 69, 70). Foundry does not contend, as Alcatel incorrectly assumes, that the tying is *per se* unlawful, but rather that it constitutes an independent act of exclusionary conduct that compounded the anticompetitive effects of Alcatel's initial deception of the IEEE. Thus, Foundry's theory is perfectly consistent with *U.S. Philips Corp. v. Int'l Trade Commission*, 424 F.3d 1179 (Fed. Cir. 2005). *Philips* recognized that tying of patents could be a rule-of- reason violation, i.e., that it could be exclusionary. Alcatel asserts that its tie is not "likely to be illegal under the rule of reason given the recognized efficiencies it generates." (D.I. 36 at ¶ 17). However, this self-serving conclusion is not sufficient to support a motion to dismiss. Moreover, contrary to Alcatel's assertion, Foundry has alleged, implicitly if not explicitly, distinct demand for the different tied and tying products because Foundry has alleged that Alcatel has tied essential patents (the

property rights do not confer a privilege to violate the antitrust laws." *Id.* at 1325.
*Accord* 3 Areeda, *supra*, ¶ 704a (recognizing that a patent is "no different than any other
property right" and that a patent holder can violate the antitrust laws to the same extent a
property owner can).

Here, Foundry is not complaining about a simple, unilateral refusal to license, but
rather about deception on the IEEE that had an anticompetitive lock-in effect on Foundry.
Namely, Foundry alleges that Alcatel has (i) engaged in deceptive conduct to entice the
marketplace, including Foundry and competitors of Alcatel, to adopt and implement an
industry standard in which it now claims is covered by its patents, (ii) violated the
published policies of the standard-setting organization by failing to disclose its patents
and patent applications, and (iii) breached its promise to the IEEE and consumers to grant
licenses on reasonable and non-discriminatory terms. (*See* D.I. 20 at Intro., ¶¶ 16, 22-26,
29-30, 34, 36, 40, 47-48.)   As recognized by *Rambus*, such a combination of factors
violates the antitrust laws and far exceeds the patent monopoly granted by Congress.

Indeed, such deception is precisely the kind of conduct that constitutes the
exclusionary-conduct  element of a Sherman Act § 2 violation. *See Rambus, supra,* at 29,
36 ("This sort of deceptive conduct is not competition on the merits. . . . and deception
that thwarts informed choice is not competition on the 'basis of efficiency'"); *Aspen
Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("If a firm has
been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to

---

'830 and '090) to nonessential patents. (*See* D.I. 20 at ¶ 70.) Foundry has also alleged
anticompetitive effects in the tied product market as a result of its substantial commerce
in that market. *Id.* To be sure, no tie has actually been achieved because Foundry has
resisted Alcatel's coercion so no foreclosure percentage can be calculated, but Foundry is

characterize its behavior as predatory.") (citations omitted); *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001) (holding Microsoft's deception as to Java applications to be exclusionary). Accordingly, Foundry has not only suffered antitrust injury, but is has also properly alleged a Sherman Act § 2 claim.

Finally, Alcatel argues that "important public policy rationales" justify Alcatel's deception. (*See* D.I. 36 at 20.) In particular, Alcatel asserts a need to protect confidentiality of patent applications. *Id.* However, the FTC rejected such rationales in the analogous *Rambus* case, noting that "[d]eceptive conduct is extraordinarily difficult to justify." *Rambus*, *supra*, at 69 ("Rambus's supposed desire to maintain the secrecy of its intellectual property does not justify the totality of its deceptive conduct in the standard-setting context.").[8] Moreover, Alcatel could have complied with the IEEE disclosure requirements without revealing any trade secrets because the existence of a patent application can be disclosed without revealing "the technical know-how of the invention itself." *See* H. Hovenkamp, *supra*, § 35.3 at 35-40. In any event, the assertion of a possible defense is an insufficient basis for a motion to dismiss.

---

nevertheless entitled to injunctive relief requiring Alcatel to offer its '090 and '830 patents on an unbundled basis.

[8]    Alcatel's reference to IEEE's comments to the FTC is incomplete and misleading. *See* (D.I. 36 at 21). The IEEE also noted that "[s]ince 1992 . . . there has been a growing trend for standards developers to encourage the disclosure of patent applications . . . ." It also concluded that "a request by a patent holder for royalties under reasonable and nondiscriminatory terms and conditions *is justified when awareness of an applicable patent, which was not intentionally withheld, becomes known after the standard is adopted.*" *See* Letter from B.C. Johnson, President, IEEE-SA, to Donald S. Clark in the FTC Office of the Secretary, at 3-4 (April 17, 2002) (emphasis added), *available at* http://www.ftc/gov/os/comments/intelpropertycomments/ ieee.pdf, at 6 [hereinafter, "IEEE Comment to FTC"] (emphasis added).

### C.    FOUNDRY HAS SUFFICIENTLY ALLEGED A RELEVANT ANTITRUST MARKET

The Amended Complaint expressly defines the relevant product market as the "technology market for user authentication for port-based network access control." (D.I. 20 at Intro.; ¶ 51.) Moreover, the Amended Complaint alleges the characteristics of that relevant market, including high barriers to entry (¶ 53), networks effects (¶ 54), the market shares of competitors (¶ 52), and Alcatel's market power in that market (¶ 51). In addition, Foundry has alleged lock-in effects that prevent customers from readily substituting away from products in the defined markets. (D.I. 20 at ¶¶34, 35, 40, 53.)

Alcatel asserts that these allegations are insufficient as a matter of law because, Alcatel claims, there are insufficient allegations of "interchangeability of use." (D.I. 36. at 3.) However, as discussed below, such fact-specific allegations are not required in a complaint, and, in any event, the Complaint contains allegations demonstrating the absence of interchangeability. (D.I. 20 at ¶¶34, 35, 40, 53.)

Rule 8(a) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing the pleader is entitled to relief," and the level of specificity required in pleading an antitrust claim is no different from other causes of action. *See* WRIGHT & MILLER, FEDERAL PRAC. & PROC. § 1228 (2d ed. 1990); *Fusco v. Xerox Corp.,* 676 F.2d 332, 337 (8th Cir. 1982). As the leading antitrust treatise states, the complaint need only plead  sufficiently to "inform the other party and the court of the substantive propositions to be tested legally and factually by the litigation." 2 Areeda, *supra*, at ¶307a. Further detail required to *prove* the relevant market is best left until the completion of discovery. "Because market definition is a deeply fact-intensive inquiry,

23

courts hesitate to grant motions to dismiss for failure to plead a relevant product market."
*Todd v. Exxon,* 275 F.3d 191, 199-200 (2d Cir. 2001).

Closely on point is *Berlyn v. Gazette Newspapers, Inc.,* 157 F. Supp. 2d 609, 616-18 (D. Md. 2001). There, the court found that plaintiff's pleading of a relevant market was legally sufficient to withstand a motion to dismiss, even though the plaintiffs did not expressly allege the absence of interchangeability of use. The court reasoned that the complaint, like Foundry's, stated a reasonable rationale for defining the product market and that "a final determination of the definition of both the product and geographic components of the relevant market must await the completion of discovery." *Id.* at 617. The court noted that "defining the relevant market is a fact-intensive inquiry, and therefore, courts hesitate to dismiss a complaint for failure adequately to plead a relevant market." *Id.*

Alcatel asserts that "Third Circuit precedent requires that an antitrust plaintiff define a relevant market with reference to the principle of reasonable interchangeability of use." (D.I. 36 at 3.) However, as discussed below, the Third Circuit cases that Alcatel cites do not require such a test. For example, the court in *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.), *cert. denied,* 439 U.S. 838 (1978), did not even consider the level of specificity required for proper pleading of a relevant market at the complaint stage. Rather, the issue was whether the district court had properly defined the market on the merits. The portions of *SmithKline* cited by Alcatel concern how to *prove* a relevant market *on the merits,* which is a very different from satisfying notice-pleading requirements.

To be sure, in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, the Third Circuit criticized the plaintiff for failing to define a relevant market that included "all interchangeable substitute products." 124 F.3d 430, 436 (3d Cir. 1997). However, far from establishing a bright-line rule, the court referred to the interchangeability test to underscore the shortcomings of plaintiff's unreasonably narrow and wholly implausible market consisting of a single manufacturer's product (*i.e.*, "ingredients, supplies, materials and distribution services used in the operation of Domino's [Pizza] stores" rather than all "dough, sauce and cups available from other suppliers and used by other pizza companies"). *Id.* at 437-438. The court expressly noted that, in contrast with most cases where "proper market definition can be determined only after a factual inquiry," in *Queen City* it was "uncontroverted that Domino's approved supplies and ingredients [were] fully interchangeable in all relevant respects with other pizza supplies outside the proposed relevant market." *Id.* at 436, 440. Under such circumstances, which are not present here, it was perfectly appropriate to require allegations of non-interchangeability.

*Queen City* is consistent with other "[c]ases in which dismissal on the pleadings is appropriate," which involve "failed attempts to limit a product market to a *single* brand, franchise, institution, or comparable entity that competes with potential substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d. Cir. 2001) (emphasis added). *Cf. Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 n.12 (3d Cir. 1992) (noting that allegation of "wholly implausible" market might warrant dismissal on summary judgment).

Foundry has not defined the relevant market to encompass only a single brand or similarly narrow item. Rather, Foundry has defined the market to include *all*

25

technologies that accomplish "user authentication for port-based network access to
LANs." (*See* D.I. 20 at Intro.; ¶ 51.)  Unlike in *Queen City*, Foundry has alleged an
economically plausible market.  Both courts and antitrust agencies have recognized
technology markets such as the one alleged by Foundry.  *See, e.g., Discovision Assocs. v.
Disc Mfg., Inc.*, No. 95-21, 1997 WL 309499 (D. Del. Apr. 3, 1997) (involving alleged
technology markets for encoded CD technology, CD replication technology, and CD
mastering technology).  *See also* U.S. Department of Justice and Federal Trade
Commission Merger Guidelines, 4 Trade Reg. Rep. (CCH) ¶13,104  (recognizing
technology markets).

     Finally, even if Foundry had not alleged any market, it would still have stated a
valid cause of action.  Monopoly power can be established by "direct evidence of such
power – *i.e.,* the power to raise price above competitive levels or to exclude competition."
*Rambus, supra,* at 72.  When such proof exists, there is no need to define a market.  *Id.;*
3A Areeda, *supra*, at ¶801a1.  Here, Foundry has not only alleged a relevant market, but
it has also alleged direct evidence of monopoly power, making the market definition issue
merely cumulative evidence of monopoly power.  (*See* D.I. 20  at ¶¶ 40, 67, 68, 70.)

### D.     FOUNDRY'S FRAUD CLAIMS ARE NOT TIME-BARRED

     As Alcatel asserts, Delaware imposes a three-year limitations period on actions
for fraud.  However, under the doctrine of "inherently unknowable injuries," the
limitations period is tolled where there were "no observable or objective factors to put
[plaintiff] on notice of *an injury*."  *See In re Dean Witter P'ship Litig.*, No. Civ.A. 14816,
1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (emphasis added).  The doctrine of
"inherently unknowable injury" does not require a plaintiff to anticipate, or even be

aware of, the possibility of an injury when the injury could only be "triggered" by the actions of another party, such as the filing of a patent infringement claim. *See Isaacson v. Artisan's Sav. Bank*, 330 A.2d 130, 133 (Del. 1974) (discussing accounting malpractice injury to a taxpayer whose cause of action against his accountant was inherently unknowable until the IRS decided to assert a claim).

Here, the doctrine applies because, as set forth above, Alcatel took purposeful steps that made it impossible for Foundry to know that it had suffered any injury until Alcatel filed its patent infringement case. (*See* D.I. 20 at ¶¶ 40, 41, 42, 65, 86, 87, 88.)

Alcatel argues that Foundry could have discovered Alcatel's patent applications more than three years before this suit was filed. (D.I. 36 at 28.) However, as Defendants aptly note, mere publication of a patent application does *not* provide constructive notice of the claims in the issued patent: "Standards committees realize that until a patent has been issued . . . the scope of valid patent claims has not been determined." (D.I. 36 at 21.) (quoting IEEE Comments to FTC, at 6.) Moreover, Alcatel never indicated (nor could Foundry have discovered) that Alcatel would claim Foundry infringed the '090 patent by merely practicing the 802.1X REV standard. Alcatel did not disclose its '090 patent application to Foundry or the IEEE prior to the issuance of the patent, and the '090 patent did not issue until March 29, 2005. (D.I. 20 at ¶ 44.)

Finally, where the applicability of the doctrine of "inherently unknowable injuries" turns "on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate." *Dean Witter,* 1998 WL 442456, at *6 n.44. *See also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 321 (Del. 2004) (reversing the Court of Chancery's grant of a motion to dismiss because the question of commencement and

tolling of the three year statute of limitations was fact intensive and could not be decided

as a matter of law).  In sum, Foundry's fraud claim is timely.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny

Defendants' Motion to Dismiss the Amended Complaint.

POTTER ANDERSON & CORROON LLP

Of Counsel:

William L. Anthony
Matthew H. Poppe
Michael F. Heafey
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025
(650) 614-7400

Garret G. Rasmussen
Antony P. Kim
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, DC 20007-5135
(202) 339-8400

Dated:  November 22, 2006
763662

By:  _/s/ Philip A. Rovner_
     Philip A. Rovner (#3215)
     Hercules Plaza
     P.O. Box 951
     Wilmington, Delaware  19899-0951
     (302) 984-6000
     provner@potteranderson.com

*Attorneys for Plaintiff Foundry Networks, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on November 22, 2006, the within

document was filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following; that the document was served on the

following counsel as indicated; and that the document is available for viewing and

downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Josy W. Ingersoll, Esq.
John W. Shaw, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391
jingersoll@ycst.com
jshaw@ycst.com

I hereby certify that on November 22, 2006 I have sent by E-mail and

First-Class Mail the foregoing document to the following non-registered participants:

Robert W. Kantner, Esq.
Mary L. Scott, Esq.
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
Robert.kantner@bakerbotts.com
Mary.scott@bakerbotts.com

G. Irvin Terrell, Esq.
Rufus W. Oliver, III, Esq.
Scott Partridge, Esq.
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
Irv.terrell@bakerbotts.com
Rufus.oliver@bakerbotts.com
Scott.partridge@bakerbotts.com

        /s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com